*In re* CANADA NORTHERN RY. *v.* INTERNATIONAL BRIDGE Co.
and others.

(*District Court, N. D. New York.* ——, 1880.)

1. JUDICIAL ACTION—USE OF EASEMENT.

A determination by a court, under the authority of a statutory enactment, in a case of disagreement, of the " terms and conditions " upon which a railway company should be entitled to the use of a bridge and its appurtenances, after hearing the allegations and proofs of the parties, is not an improper exercise of the judicial function.

2. SAME—SAME.

It is no less the exercise of a judicial function to prescribe a rule of conduct, or protect the existence of a right during a future period, than it is to determine whether the right has been invaded in the past.

3. SAME—SAME.

When a statute refers the question of the conditions upon which an easement shall be enjoyed to a judicial tribunal for decision, after hearing the proofs and allegations of the parties, the implication is cogent that the decision shall proceed upon settled principles of law and equity, and not upon arbitrary discretion.—[ED.

An act of congress, approved June 30, 1870, authorized the construction and maintenance of a bridge across the Niagara river by the International Bridge Company, and provided that "all railway companies desiring to use said bridge shall have and be entitled to equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and of all the appurtenances thereto, under and upon such terms and conditions as shall be prescribed by the district court of the United States for the northern district of New York, upon hearing the allegations and proofs of the parties, in case they shall not agree." The Canada Southern Railway Company subsequently presented their petition under this act to the district court of the United States for the northern district of New York, and alleging that it had never been able to agree with the International Bridge Company upon the amount of compensation which it should pay for the use of such bridge, prayed the court to determine and prescribe the terms and conditions upon which it might use the said bridge, together with the machinery, fixtures, and approaches.

*A. P. Laning,* for Canada Southern Ry. Co.

*E. C. Sprague,* for International Bridge Co.

WALLACE, D. J. After fully considering the preliminary questions presented on the argument I am of opinion that it was competent for congress to impose such conditions as in its discretion might seem proper concerning the use and control of the International bridge, and that by the act in question ample jurisdiction was conferred upon this court to determine the present controversy.

While it was competent for the legislature of New York and the Canadian parliament to charter corporations and grant franchises for the construction and maintenance of the bridge, so far as their respective sovereignties were concerned, the corporation could only obtain the full benefits of the grant by the consent of congress. The subject of the grant was the right to build and control a bridge which would be a highway of transportation not only between the United States and a foreign country, but also the eastern and western states. It was therefore of the first importance to ascertain whether congress would sanction the purposes of the grant, and the terms and conditions upon which such sanction could be obtained.

It was for congress to determine when its power to regulate commerce should be brought into activity, and as to the regulations and sanctions which should be provided. *Getman* v. *Philadelphia,* 3 Wall. 725; *The Clinton Bridge,* 10 Wall. 454; *Pennsylvania* v. *The Wheeling Bridge Co.* 18 How. 421.

By the act in question congress gave its sanction in advance, but upon the conditions that all railway companies desiring to use the bridge should have equal rights and privileges in the passage and in the use of the bridge, and of the machinery, fixtures, and approaches, "under and upon such terms and conditions" as this court should prescribe, "upon hearing the proofs and allegations of the parties in case they should not agree." The power of congress over the subject was plenary. It exercised the power, and the International Bridge Company availed itself of the privileges and assented to the conditions of the legislative sanction. Congress could not delegate its

legislative power to any other authority, nor could it confer jurisdiction upon this court to exercise any but judicial functions; and if the act in question, in any of its provisions, contravenes these maxims of constitutional law as to those provisions, it is inoperative. But the act is not obnoxious to these objections. It devolves upon this court simply the judicial functions of determining the rights of parties when they may be brought into controversy.

The rights are created and established by the act; and this is the office of the legislative department. The power to adjudicate upon these rights, to ascertain, when controversy arises, their extent and value, and apply the appropriate remedy for their protection, is conferred upon the court; and this is the peculiar province of the judicial department.

It is argued that the act attempts to confer upon the court the power to fix the rate of tolls which the International Bridge Company may charge, and that this is a legislative and not a judicial function. If congress had fixed the rate of tolls, as it had the right to prescribe the conditions upon which the franchise might be enjoyed, no other authority could have intervened to change these conditions. But suppose the act had, in terms, provided that the bridge company might charge reasonable tolls, would not this have been a complete exercise of the legislative power, and would it not have remained for the judicial department to decide, when controversy should arise, what were or were not reasonable tolls? And if the act had provided for such a determination by a judicial tribunal, would this have been unconstitutial? It seems to me clearly not. It is no less the exercise of judicial functions to prescribe a rule of conduct or protect the existence of a right during a future period, than it is to determine whether the right has been invaded in the past. It is one of the common offices of a court of equity to do this.

It is said that that which distinguishes a judicial from a legislative act is that the one is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the regulation of all future cases falling

under its provisions. It seems to me that this statement of the distinction is incomplete. It is essential to judicial action that there be parties and a controversy. Judgment is only pronounced after a hearing. That would not be judicial action which should determine the existing law in relation to some existing thing, already done or happened, without the intervention of parties and the existence of a controversy; and when there are parties and a controversy it is not less a judicial act because the determination regulates rights and obligations in the future, and the manner in which they shall be observed. The act of congress in effect provides that all the companies using the bridge shall have equal privileges in its use, and for a reasonable compensation, to be ascertained by the court if the parties cannot agree. The phraseology employed is unfortunate, and fairly suggests the objections which have been urged; but when the act refers the question of the conditions upon which an easement shall be enjoyed to a judicial tribunal for decision, after hearing the proofs and allegations of the parties the implication is cogent that this decision shall proceed upon settled principles of law and equity, and not upon arbitrary discretion.

An act of congress will not be declared unconstitutional unless every reasonable doubt to the contrary is resolved against its validity; and it is the duty of courts so to construe the act as to uphold it, if possibly consistent with the language used.

Had it been the intent of the act to confer jurisdiction upon the court simply to enforce equality, and prevent unfair discrimination for or against any of the several corporations in the use of the bridge, it would have been unnecessary to authorize the court to prescribe the "terms and conditions" upon which the various companies might use the bridge. It would have sufficed to confer jurisdiction in general terms over any controversy that might arise, and it would then have been competent for the court to enforce equality upon any of the principles and by any of the remedies known to the court. Effect must be given to the language used. The conclusion reached is also in harmony with considerations of a

more general character. It can hardly be supposed that congress intended to grant unlimited authority to a corporation to fix any compensation it might see fit for the use of the bridge, because it would then be in the power of the corporation to do indirectly what it has not intended should be done. The bridge company could charge such tolls that no railway company could use the bridge unless it should be a stockholder, and thereby receive in dividends what it might pay out for tolls. The bridge was to be an enterprise of great public importance, and it is reasonable to suppose that congress intended carefully to guard the public interests which were concerned.