DARNELL *v.* EDWARDS ET AL., CONSTITUTING THE MISSISSIPPI RAILROAD COMMISSION.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF MISSISSIPPI.

No. 216.　Argued April 25, 1917.—Decided June 11, 1917.

In determining whether railroad rates fixed by a state authority are confiscatory because not yielding a proper return, the basis of calculation is the fair value of the property used in the service of the public.

Therefore, when a railroad which was originally constructed and owned by two is operated by one of them under an arrangement whereby his interest will end and become vested in the other at the expiration of a term of years, the original investment of the operating owner should not be charged in annual instalments against the annual operating revenue, in determining whether the rates fixed are remunerative.

There is a strong presumption in favor of rates fixed by an experienced administrative body after a full hearing.

Rates should not be held too low upon evidence that they proved un-

remunerative during a brief period, when conditions for traffic were abnormally poor and little effort was made to improve them.

In determining the adequacy of rates, the circumstance that the railroad has been unwisely built in an unfavorable locality, and the nature and value of the service actually rendered by it to the public, are matters to be considered.

*Semble*, that, in testing the validity of rates affecting a limited class of traffic in which the railroad is for the time engaged, an extra cost of construction, not justified by that traffic but incurred with a view to extending the road ultimately into more lucrative territory, should not be accounted as a part of the fair value by which the rates must be gauged.

In the absence of a fair test of rates challenged as confiscatory, and in the presence of some doubt of their adequacy, dismissal of the bill should not be absolute, but should be without prejudice to another suit, in case they should prove confiscatory when fully and fairly tested.

Final decree following 209 Fed. Rep. 99, modified and affirmed.

THE case is stated in the opinion.

*Mr. Roger Montgomery*, with whom *Mr. William P. Metcalf* was on the brief, for appellant.

*Mr. James N. Flowers, Mr. George H. Ethridge*, Assistant Attorney General of the State of Mississippi, *Mr. James Stone* and *Mr. J. B. Harris* for appellees, submitted.

MR. JUSTICE PITNEY delivered the opinion of the court.

Appellant filed his bill in the District Court against the members of the Mississippi Railroad Commission, an administrative body having the usual powers, in which he sought relief by injunction against an order prescribing maximum rates on logs in carload lots transported in intrastate commerce, upon a railroad operated by him; the ground of his complaint being that the rates were so low as to be confiscatory and therefore violative of the due process of law provision of the Fourteenth Amend-

ment. The court refused a preliminary injunction (209 Fed. Rep. 99), and, upon final hearing, dismissed the bill. The case is brought here by direct appeal because of the constitutional question, under § 238, Jud. Code.

The railroad in question is known as the Batesville Southwestern, and extends from a junction with the Illinois Central at Batesville for a distance of about 17 miles through a timber country, its entire line being within the State of Mississippi. It was built jointly by appellant and the Illinois Central Railroad Company, under a contract pursuant to which he disbursed approximately $146,000 and the company approximately $98,000. The contract was made in 1910, and by its terms Darnell was to maintain and operate the road for twenty years, the company to pay him for maintaining it $143 per mile per annum, and the road was to become the property of the company at the end of twenty years without further payment; the agreement, however, being subject to termination by the company prior to the expiration of the twenty years upon specified terms. The building of the road was commenced about June, 1911. Darnell began operating it as a common carrier in March, 1912, but its construction was not finally completed until about the middle of June, 1914.

The road is of standard gauge and construction, ballasted, and built in a first-class manner. Its traffic consists almost wholly of shipments of logs in carload lots from points along the line to the terminus at Batesville.

Pending the construction of the road, the Batesville Southwestern Railroad Company was organized as a corporation to take over the property, but the road remained in the hands of Darnell as lessee. In April, 1912, he established and promulgated a tariff providing a uniform rate for freight on logs in carload lots, with a minimum of 4,500 feet, regardless of the kind or character of the timber; which was, for 10 miles and under, $2.80 per thousand

feet; 10 to 15 miles, $3.35 per thousand; 15 to 20 miles, $3.90 per thousand. Complaint having been made to the Mississippi Railroad Commission, by citizens interested in the logging business, that these rates were extortionate, unjust, and confiscatory, a hearing was had, and, as a result, the commission, in July, 1913, made an order reducing the rates nearly 50 per cent. on oak, ash, and hickory, and more than 50 per cent. on other kinds of logs.

It appears that at the time of the construction of the railroad Darnell individually was the owner of a large amount (at the time of the hearing he owned 19,000 acres) of timber land in the country through which the road was projected, and that this furnished the reason for his interest in its construction and operation. At the same time he owned the principal part of the stock of R. J. Darnell, Incorporated, a lumber-milling corporation; but between that time and the time of the hearing the bulk of the stock had passed into the hands of his sons, he still remaining president of the company, and having sold to it the timber on the lands owned by him, the company agreeing to cut it, have it hauled, and loaded on the cars, and to pay him a fixed amount per stump.

The bill of complaint showed gross receipts from the operation of the railroad for the year ending June 30, 1913, amounting to $15,553.01, and operating expenses $4,296.20, leaving net earnings of $11,256.81. Against this, however, complainant charged as an annual rental $8,133.39, this being 1/20 of $162,667.69, then stated to be the amount invested by him in the construction of the road. Deducting this so-called rental charge left only $3,123.42, or less than 2 per cent. on the sum alleged to have been expended by complainant. These figures were the result of the rates established by him; and it was alleged that at the much lower rates established by the commission the road would yield no return above operating expenses.

The bill was filed in September, 1913, the commission's rates not having as yet been put into effect. At the preliminary hearing the District Court held (209 Fed. Rep. 99) that upon the showing then made it would not interfere with the commission's rates at least until final hearing, thus affording a period for experiment as to whether new business would be developed in volume sufficient to make those rates remunerative.

Upon the final hearing, evidence having been submitted by both sides, the court's decree was to the effect that the rates established by the commission were reasonable and should be enforced.

In this court appellant insists, first, that the District Court erred in holding that he was not entitled to charge against the annual operating revenue 1/20 of the amount expended by him in the construction of the road. We are clear that this contention is untenable. In determining whether rates are confiscatory because not yielding a proper return, the basis of calculation is the fair value of the property used in the service of the public. *Smyth* v. *Ames*, 169 U. S. 466, 546; *Minnesota Rate Cases*, 230 U. S. 352, 434. The hypothetical annual payments of 1/20 of the cost of the road to Darnell were not a proper rent charge, and bore no relation to the actual value of the property. They arose out of the contractual arrangement between Darnell and the Illinois Central, and were in the nature of an amortization charge to take account of his diminishing interest in the road. But, upon that theory, the interest of the Illinois Central increased in value by as much as that of Darnell decreased. In any aspect, the transference of his interest to the Illinois Central, and any charge on that account, made by him for purposes of his own bookkeeping, had no proper relation to the question of the value of the property, and hence were of no concern to the public.

It is insisted that upon the proofs, and especially by

actual experiment, the rates established by the commission were shown to be confiscatory.

It is well established that in a question of rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing. Besides this, there was affirmative evidence before the District Court to the effect that the rates were reasonable. The evidence for complainant, tending to show they were non-remunerative, while based upon actual experience in the operation of the road, yet relates to only a brief period when conditions were abnormal. The road was a new one, not completed until June, 1914, that is, after the filing of the bill and shortly before the final hearing. The commission's rates, although promulgated in June, 1913, were not put into effect until September 10, and the period of experimentation to which the evidence related extended only from the date last mentioned to March 31, 1914. Practically the entire business of the road, at first, was hauling logs from complainant's land to a mill operated by R. J. Darnell, Incorporated, at Memphis. That mill was destroyed by fire in June, 1913, and thereafter the corporation constructed a mill at Batesville, but this was not placed in operation until March 17, 1914. In consequence there was a heavy falling off in traffic on the road, there being no Darnell shipments except such logs as were on hand when the Memphis mill was burned.

The evidence throws doubt upon the question whether the road, if built merely for the purpose of serving the timber country that is tributary to its present line, was not an extravagant venture. But, as yet, there has been no serious effort to develop traffic even from that country, aside from complainant's own properties. If the road was built rather as a branch of the Illinois Central, and with a view to extending it into a more lucrative territory, any extra cost of construction attributable to this is

hardly to be accounted as a part of the fair value devoted to the use of the timber traffic. The circumstance that a road may have been unwisely built, in a locality where there is not sufficient business to sustain it, may be taken into account. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 412. And the nature and value of the service rendered by the company to the public are matters to be considered. *Covington &c. Turnpike Co.* v. *Sandford*, 164 U. S. 578, 597; *Smyth* v. *Ames*, 169 U. S. 466, 544.

In the case before us, if the earning capacity of the railroad, present and prospective, really is as small as appellant claims, it may be doubted whether the road is worth what it cost. But it is sufficient for the present to say that the experimental period was too brief; there is too little showing of an effort to develop traffic along the line of the road from property other than that of complainant; and conditions during the entire period covered by the testimony have been too abnormal to enable us to say that the commission's rates are confiscatory.

The decree under review should be so modified that the dismissal of the bill shall be without prejudice to another suit to restrain the enforcement of the commission's rates, if after a full and fair test they shall be found to be confiscatory (*Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 19; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 55), and, as so modified, it should be affirmed.

*Modified and affirmed.*