# MORGAN v. UNITED STATES et al. and forty-nine other cases.

### Nos. 2328–2378.

District Court, W. D. Missouri, W. D.
Oct. 29, 1934.

John B. Gage and C. E. Cowherh, both of Kansas City, Mo., for petitioners.

Wendell Berge, Sp. Asst. to Atty. Gen., Harold M. Stephens, Asst. Atty. Gen., Carl McFarland, Sp. Asst. to Atty. Gen., and Seth Thomas, Sol. of Department of Agriculture, of Washington, D. C. (J. S. Bohannan and G. N. Dagger, both of Washington, D. C., of counsel), for defendants.

Before VAN VALKENBURGH, Circuit Judge, and REEVES and OTIS, District Judges.

OTIS, District Judge.

These are fifty cases in equity contemporaneously initiated in this court, submitted together and now for decision after final hearing. The prayer of the petition in each case is for injunctive relief against the enforcement of a certain order of the Secretary of Agriculture, dated June 14, 1933, fixing maximum rates and charges for stockyard services rendered by the petitioners at the Kansas City stockyards in Kansas City, Mo.

The business of each of the petitioners is that of a live stock selling and buying (or marketing) agency. It is a business affected with a public interest whose rates and charges for services rendered by it to its patrons are subject to governmental regulation. Since the business of each of the petitioners directly affects commerce among the several states, Congress is authorized by the Constitution (article 1, § 8, cl. 3) to legislate touching such rates and charges. Congress has done that in the so-called Packers and Stockyards Act (42 Stat. 163, § 301 et seq.), 7 USCA § 201 et seq., providing in that act that such rates and charges shall be such only as are reasonable and delegating to the Secretary of Agriculture the function and power of determining what rates and charges are reasonable. The validity of this legislation has been determined by the Supreme Court (Tagg Bros. v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524) and is not questioned in these cases.

The Packers and Stockyards Act provides that:

"Sec. 310. Whenever after full hearing upon a complaint made as provided in section 309 [section 210 of this chapter], or after full hearing under an order for investigation and hearing made by the Secretary on his own initiative, either in extension of any pending complaint or without any complaint whatever, the Secretary is of the opinion that any rate, charge, regulation, or practice of a stockyard owner or market agency, for or in connection with the furnishing of stockyard services, is or will be unjust, unreasonable, or discriminatory, the Secretary—

"(a) May determine and prescribe what will be the just and reasonable rate or charge, or rates or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what regulation or practice is or will be just, reasonable, and nondiscriminatory to be thereafter followed; and

"(b) May make an order that such owner or operator (1) shall cease and desist from such violation to the extent to which the Secretary finds that it does or will exist; (2) shall not thereafter publish, demand, or collect any rate or charge for the furnishing of stockyard services other than the rate or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be; and (3) shall conform to and observe the regulation or practice so prescribed." 7 USCA § 211.

Pursuant to the provisions of the act, the Secretary of Agriculture on his own initiative on April 7, 1930, ordered an inquiry into the reasonableness of the rates and charges of the petitioners for stockyard

services rendered by them. A hearing followed before an examiner designated for that purpose. Testimony was taken by him which fills 6,721 typewritten pages in addition to which 159 exhibits were offered in evidence. Followed an oral argument before an "Acting Secretary of Agriculture." Thereafter, on May 18, 1932, the Secretary of Agriculture issued an order fixing the maximum rates and charges. A petition for rehearing was granted July 15, 1932. At the rehearing conducted by an examiner, testimony was taken which fills 3,091 typewritten pages in addition to which 111 exhibits were offered in evidence. Followed a second oral argument before an "Acting Secretary of Agriculture." Thereafter, on June 14, 1933, the Secretary of Agriculture made and issued findings of facts and the order based thereon fixing rates and charges which is now attacked. A petition for a rehearing as to this order was denied.

The rates and charges of petitioners which were in effect on June 13, 1933, and which the Secretary held were unreasonable, were in the form of a fixed charge per head of live stock bought or sold, the charge varying with the kind of live stock and with the number of animals involved in any transaction. Thus, for selling calves the charge was 30 cents per head for a consignment of from 1 to 20 head and 25 cents per head for all over 20 head. The maximum charges ordered by the Secretary were in the same form. For illustration, the Secretary's order required that the maximum selling charge as to calves should be 35 cents per head in a consignment of 1 head, 20 cents a head in a consignment of from 1 to 40 head, 5 cents per head for all over 40 head.

We preface with this brief preliminary statement our consideration of the issues.

In so far as the subject yet has been developed in judicial opinions, there are possible only five attacks on such an order as that with which we are here concerned and the petitioners have made all of them save one. They are: (1) That the statutory procedure was not followed; (2) that the findings do not support the order; (3) that the findings are not supported by the evidence; (4) that erroneous rules of law were followed to reach the findings; (5) that the rates and charges fixed in the order are confiscatory and so violative of constitutional rights. Tagg Bros. v. United States, supra; Interstate Commerce Commission v. Illinois Central R. Co., 215 U. S. 452, 454, 30 S. Ct. 155, 54 L. Ed. 280.

## The Procedure.

1. Before the Secretary lawfully can make an order of this character, he must accord a "full hearing to the interested parties." Section 310 of the act (7 USCA § 211). In the petitions it was alleged that a full hearing was denied in that (1) each and every of the petitioners was denied a separate hearing; (2) that the Secretary of Agriculture in person did not hear arguments on the evidence, but without authority in law delegated that duty to assistant secretaries designated as acting secretaries; and (3) that the Secretary signed the order without reading the evidence. On a preliminary hearing, we sustained a motion to strike these allegations from the petitions. We think it is unnecessary now to elaborate the obvious observation that the theory of these allegations is supported by nothing in the act and that a construction of the act consistent with that theory would destroy it altogether as a measure capable of practical administration.

## Findings Support Order.

2. The Secretary made 162 findings of fact upon the evidence heard at the original hearing and at the rehearing. No contention is made but that these findings support the order. Unquestionably, they do support the order and that fully.

## Findings Supported by Evidence.

3. The business of a live stock agency is of a personal service character requiring little invested capital. To arrive at what are reasonable rates and charges for the services rendered by such an agency at a given place, as at the Kansas City Stockyards in Kansas City, Mo., the following factors must be considered: (1) The total volume of business to be transacted; (2) the number of men required for the efficient handling of that business; (3) the reasonable cost of handling the business, including reasonable compensation of the men necessarily employed and other necessary and proper costs; (4) the capital investment required for the efficient handling of the volume of business reasonably to be expected; (5) what is a proper return on the capital so invested; (6) what is a reasonable compensation for management and a reasonable profit. The findings made by the Secretary included all of these factors and every other conceivable factor necessary to be considered. Some of the findings are challenged as contrary to the evidence.

Save possibly where the issue of confiscation is for determination, the settled rule

is that the findings of the Secretary in a proceeding of this character "must be accepted by the court as conclusive, if the evidence before him was legally sufficient to sustain them." Tagg Bros. v. United States et al., 280 U. S. 420, 444, 50 S. Ct. 220, 226, 74 L. Ed. 524. The court is not concerned with the weight of the evidence, with whether its judgment concurs with that of the Secretary, but only with the question, Is any finding essential to the order under review unsupported by any substantial evidence?

With this rule in mind we have gone to the record, with the aid of briefs submitted, and have found therein substantial testimony to support every challenged finding, nor do we find any justification for the contention of petitioners that in arriving at his findings material and relevant evidence was ignored. The important and essential findings, such as, for example, how many hogs an efficient salesman should sell in a given time, what are reasonably compensatory salaries salesmen should receive, what costs are legitimate and what unnecessary, what wastes may be eliminated, indeed almost every finding that was made except those which were merely statistical, clearly depend upon the application to the testimony of the judgment of him charged with the duty of making findings. That duty the law imposes on the Secretary. We cannot overturn his judgment as to such matters when there is evidence to support his findings.

### Claimed Errors of Law.

■ It is true that such an order as the one here attacked must be set aside if it rests upon an erroneous rule of law. Tagg Bros. v. United States, 280 U. S. 420, 442, 50 S. Ct. 220, 74 L. Ed. 524. The petitioners assert the applicability of this principle to these cases, but just what erroneous rules of law the petitioners claim were applied by the Secretary we have had some difficulty in gathering from the petitions and briefs notwithstanding the great labor able counsel for petitioners obviously have given to their preparation.

■ There is no contention that the subject-matter sought to be regulated was not within the Secretary's jurisdiction under the statute and no allegation, therefore, of any such fundamental legal error as a misinterpretation of the statute would have been. The contentions, as best we can state them (they purport to be set out in subdivision VII of each of the petitions), are the following:

A. The costs used by the Secretary were arrived at arbitrarily and in disregard of the facts. Clearly this is not a matter of applying an erroneous rule of law, but a matter of whether the evidence supports the findings.

■ B. The Secretary ruled rightly that the reasonable rates to be fixed should include a profit, but erroneously that compensation allowed for management and the carrying of uninsurable risks included the element of profit whereas the cost of management and of carrying uninsurable risks are legitimate expenses and the petitioners are entitled to something additional as profits. The answer to the contention is that, if it be conceded that it was error to rule that the allowance for management and the cost of carrying uninsurable risks necessarily included all the profit to which an owner is entitled, in truth the rates fixed had an additional spread, above all costs, including the two specified, which spread allows and provides for the alleged omission.

■ C. The Secretary rightly ruled that the petitioners were entitled to a return on capital investment, but erroneously excluded any allowances for going concern values. Such is the contention. The evidence whereon the contention is based is to the effect that the methods and practices used by the petitioners were worth (not that they had cost) $66,401. The contention is that a return should be allowed on that amount. The view of the Secretary was that while knowledge of these methods and practices was indispensable, any one is free to use them and they are not property. Such knowledge is a part of the necessary mental equipment of those rendering live stock selling and buying service. Compensation for the service includes full return for the use of the knowledge of methods and practices. It is not an element of capital investment. We agree.

D. The Secretary erroneously excluded from consideration of costs various legitimate classes of expenses, such as insurance against normal risks. We find in the record no support for this contention.

E. Various other contentions are made in this connection which we think present no errors of law.

### Confiscation.

■ Each of the petitioners claims that the order of the Secretary violates the due process clause of the Fifth Amendment in that it deprives him of his property without due process of law. Whether the presence in these cases of this issue of confiscation entitles the petitioners to the independent judgment of the court as to the law and the facts

after a consideration of all of the testimony heard by the Secretary and also additional testimony offered before this court, never has finally been decided by the Supreme Court. Tagg Bros. v. United States, 280 U. S. 420, 443, 50 S. Ct. 220, 74 L. Ed. 524. The view that those alleging confiscation are entitled to the independent judgment of the court is supported by such cases as Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 289, 40 S. Ct. 527, 64 L. Ed. 908; Bluefield Water Works Co. v. Public Service Commission, 262 U. S. 679, 689, 43 S. Ct. 675, 67 L. Ed. 1176; Prendergast v. New York Tel. Co., 262 U. S. 43, 50, 43 S. Ct. 466, 67 L. Ed. 853; Lehigh Valley R. Co. v. Board of Public Utility Com'rs, 278 U. S. 24, 36, 49 S. Ct. 69, 73 L. Ed. 161, 62 A. L. R. 805; United Railways & Electric Co. v. West, 280 U. S. 234, 251, 50 S. Ct. 123, 74 L. Ed. 390; Phillips v. Commissioner, 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289. The view that even where the issue of confiscation is present, findings of fact made by the Secretary, if supported by substantial evidence, are conclusive, is supported by a consideration of the text of the Interstate Commerce Act (49 USCA § 1 et seq.) to which the Packers and Stockyards Act refers and by United States v. Louisville & N. R. Co., 235 U. S. 314, 320, 35 S. Ct. 113, 59 L. Ed. 245; Interstate Commerce Commission v. Union Pac. R. Co., 222 U. S. 541, 547, 32 S. Ct. 108, 56 L. Ed. 308, and the dissenting opinion in Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 297, 40 S. Ct. 527, 531, 64 L. Ed. 908, as well as by the declination of the Supreme Court to pass upon the matter in Tagg Bros. v. United States, 280 U. S. 420, 443, 50 S. Ct. 220, 74 L. Ed. 524. Whichever of these views is the correct one, it is certain that there is a strong presumption in favor of the findings made by the Secretary as well as those of any rate-making body. Darnell v. Edwards, 244 U. S. 564, 37 S. Ct. 701, 61 L. Ed. 1317.

■■■■ If we proceed on the view that the findings of the Secretary are conclusive, if supported by any evidence, and we have determined that each of them is supported by substantial evidence, then the contentions of petitioners as to confiscation must be resolved against them with the exception of one of those contentions. All of the contentions, excepting one, are based upon the theory that the Secretary's findings as to costs are contrary to the weight of the evidence and that, if correct findings were made, the costs allowed in fixing rates and charges would be so much greater than those which were allowed as that it would conclusively appear that the rates and charges fixed in the Secretary's order did not adequately provide for costs and so are confiscatory. If, however, having decided that the findings of the Secretary are sustained by substantial evidence, we are bound by his findings, then we are bound also to conclude that the Secretary's order makes full allowance for all reasonable costs in the rates and charges fixed by the order. The one contention as to confiscation not thus disposed of is that the rate of return allowed by the Secretary's order on invested capital of petitioners, which is 6 per cent. on fixed capital and 7 per cent. on working capital, as a matter of law is confiscatory. We regard that contention as without merit.

■■■■ If we adopt the view that, having raised the issue of confiscation, the petitioners are entitled to the independent judgment of this court based upon all of the evidence which was before the Secretary, as well as the additional evidence offered at the trial of these cases, only presuming that the findings of the Secretary are correct, the same conclusion touching this issue is reached by us. Such an examination of all of the testimony as reasonably can be made, in view of its immense volume, we have made, reaching the conclusion that the essential findings made by the Secretary not only are sustained by substantial evidence, but are in accordance with the weight of the evidence. Since those findings are right as to costs and since the rates and charges fixed by the Secretary's order adequately provide for costs and for a return on invested capital and for profits as to all petitioners who have shown that their agencies are efficiently conducted, the issue of confiscation must be resolved against the petitioners.

#### Other Matters.

Contentions of the petitioners which have not been referred to specifically in this opinion have received the consideration of the court and are resolved against the petitioners.

#### Findings of Fact.

In each of these cases we make findings of fact as follows:

1. The order of the Secretary of Agriculture, dated June 14, 1933, fixing maximum rates and charges for petitioners as live stock selling and buying (marketing) agencies in the Kansas City Stockyards, Kansas City, Mo., was made after full hearings accorded the petitioners, and each of them, and upon findings of fact made by the Secretary

based upon the evidence taken at the hearings.

2. The findings of fact made by the Secretary of Agriculture upon which the order of June 14, 1933, was based are supported by substantial evidence.

3. Upon an independent consideration of the evidence, including the additional evidence taken by the court at the trial of these cases, the court adopts as its findings of fact the findings of fact made by the Secretary and by reference incorporates them herein.

### Conclusions of Law.

The court concludes as matters of law:

1. That the order of the Secretary of Agriculture, dated June 14, 1933, fixing maximum rates and charges for live stock buying and selling (marketing) agencies at the Kansas City Stockyards in Kansas City, Mo., was made by the Secretary after a full hearing in all respects conforming with the requirements of the Packers and Stockyards Act.

2. That the order is fully supported by the findings of fact made by the Secretary and that those findings were based upon substantial evidence and are supported by the weight of the evidence and are not based upon any erroneous rules of law.

3. That the maximum rates fixed by the Secretary in the order are reasonable and that they do not take the property of petitioners, or any of them, without due process of law in violation of the terms and provisions of the Fifth Amendment to the Constitution of the United States.

### Indicated Decree.

Counsel for the defendants will prepare and submit to the court for approval and entry in each of these cases a decree dismissing the plaintiff's bill and assessing the costs against the plaintiff.

VAN VALKENBURGH, Circuit Judge (concurring).

I agree with the decision to dismiss the bills, but I feel impelled to add some additional views with respect to some features of the findings made by the Secretary of Agriculture in reaching the conclusions leading to his order.

The reason, or at least the main reason, for the difference between petitioners and Secretary, lies in the matter of cost allowances and reasonable return to owners of the business. As stated by counsel for the Secretary, the substantive questions are:

1. Are the Secretary's findings of reasonable costs plus reasonable profits supported by the evidence?

2. Will the prescribed rate schedule produce sufficient revenue to cover the reasonable costs plus reasonable profits as found by the Secretary?

I think we may regard the entire controversy as resolved by an answer to the first of these questions, because the second is practically conceded, the insistence being that the Secretary's allowance of costs is unreasonable and, therefore, that the resulting profits are so unreasonable as to amount to confiscation.

To my mind, basing the allowance of salaries upon the potential ability of a salesman to sell a given number of carloads in a year is too restrictive. Such ability is not subject to bare mathematical measure. One even casually familiar with stockyard operations knows that an efficient salesman must be a man of sound judgment and experience. His duties in fostering the business of the producer, in causing his product to be reared and brought to sale under favorable market conditions, are of great value and are not subject to mathematical percentage measurement. The stock does not come in such regular periods as to permit a fixed amount of sales, ratably distributed over the market year. When it does come, it must be attended to by expert and experienced men to the best advantage of the grower. It is evident, therefore, that an organization must be kept sufficient to handle the business as it is presented. Such employees must be permanent for this purpose. Capable men cannot be picked up at will. They must have a steady job, and at a wage that will reasonably compensate for the experience they bring and the service they perform. In this period, when it is emphasized that labor must receive a fitting reward, it will not do to visit upon the stockyards agencies, which are recognized as necessary to the commerce, too great a burden because of depression in the stock business. In their zeal to aid the stock raiser, government agencies must not forget the men who are essential to the making of his market. This applies in a lesser degree perhaps to yardmen and others employed in the business. It is to be emphasized that, if a market agency is to do business at all, it must have and maintain an organization sufficient to handle its business when it comes. An examination of record and briefs indicates that in various ways the agencies have striven to keep costs down. Obviously it was to their interest to do so in years lean at the

best. Their judgment as to their necessities should not be lightly set aside nor underestimated.

So with respect to getting and maintaining business. Certainly a considerable amount of advertising, circularizing, and personal contact is proper and necessary to keep this market prominently before the raisers and shippers of stock in this normal trade territory. The market agencies have to compete with other stock markets, with co-operatives, a percentage of whose profits go back to their members, with packers, and railroad yards, and with direct buyers generally. The fact that there may incidentally result competition between the agencies themselves is no sufficient ground for reducing the costs of such activities to an extremely narrow compass. Also, if such agencies are to continue, the owners, as they are termed, must be allowed to receive a return commensurate with the contribution they make to the success of this market and the risks they assume.

I do not undertake to decide that the costs demanded by petitioners may not in some degree be excessive. Of course, even the most efficient operators cannot expect to make as much out of a small volume of business as out of one much larger; but they must be prepared for any reasonable eventuality, and the return fixed must not be so low as to drive too many of these agencies out of business, to the great injury of this stock market, and, necessarily, to the shippers of stock, who would most conveniently patronize it. What the future volume of business may be is, of course, speculative, and should not be a controlling rate-making factor. The evidence is that the volume is decreasing during the periods under test. It appears that the order of the Secretary would reduce the number of men employed in handling the 1931 market from 188 to about 79. There were only fifty-nine firms originally petitioning. Nine are said to have retired from business, and, from the evidence before us, a number of others will necessarily follow.

It is true that no reasonable rate can be expected to protect all who may elect to engage in this quasi-public business, without regard to prevailing conditions; but the protection of the market against lowering an irreducible minimum is as necessary to the public interests as it is to that of the stock shippers themselves.

My reaction to the presentation made is that I should have made a more liberal allowance for costs and owner return—not necessarily as great as that demanded by petitioners, and, of course, with due regard to the number of owners accredited to each firm. Five owners in the same firm cannot each expect to receive the maximum accredited or appraised to one. But it is to be observed that the Secretary has given consideration to all the elements essential to the computation of a general rate of this nature. By the statute he is given almost dictatorial power in the establishment of such rates, provided he gives due consideration to all the elements involved, does not depart from any rule of law, and provided, further, the rates established are not clearly unreasonable and confiscatory.

Just what would be the result of applying those rates to future business upon a reasonable cost basis, or as found by the Secretary, cannot be known, because it has not yet been tried. We cannot bring to the complex conditions involved the same expert judgment as is employed by what the Supreme Court has described as "a tribunal appointed by law and informed by experience." And we are forbidden to question the soundness of the reasoning, or the wisdom of the conclusions reached, and to substitute our judgment for that of the findings and conclusions announced. I think the attack of petitioners is directed, in its last analysis, to the soundness of the conclusions reached, and I fear that we have no power to disturb them upon the showing made. Renewed application to Secretary or court may bring relief if reasonable experience, based upon the conditions imposed by the Secretary's order, is found to justify it. In this view I concur in the decision to dismiss the bills.