**CLARKSBURG–COLUMBUS SHORT ROUTE BRIDGE CO. v. WOOD-RING et al.**

No. 6739.

United States Court of Appeals for the District of Columbia.

Argued Nov. 10, 1936.

Decided Feb. 1, 1937.

STEPHENS, Associate Justice, dissenting.

———◆———

George D. Horning, Jr., of Washington, D. C., and James S. McCluer, of Parkersburg, W. Va., for appellant.

Leslie C. Garnett and H. L. Underwood, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

VAN ORSDEL, Associate Justice.

This appeal is from a decree of the Supreme Court, now United States District Court for the District of Columbia, dismissing a bill in equity whereby appellant, Clarksburg-Columbus Short Route Bridge Company, hereafter referred to as plaintiff, sought to restrain the appellee Secretary of War from continuing in force and effect an order fixing tolls to be charged and collected by the defendant Parkersburg-Community Bridge Company.

The Parkersburg Company is the owner of a bridge, constructed in 1915, spanning the Ohio river between the city of Parkersburg, W. Va., and the town of Belpre, Ohio. The Clarksburg Company is the owner of a bridge, erected in 1926, and spanning the Ohio river between the town of St. Mary's, W. Va., and the town of Newport, Ohio.

United States Highway Traffic Route No. 50, extending across the United States from the east to the west coasts, crosses the bridges of the respective companies. It divides at a point approximately 30 miles east of Parkersburg into route No. 50 north, and route No. 50 south. The north route crosses the bridge of plaintiff company, and the south route crosses the bridge of the defendant company. These bridges are integral parts of the respective routes. The northern and southern branches of route No. 50 converge at Athens, Ohio, a short distance west of these bridges, and extend again as a single highway route through to the Pacific Coast. The length of route 50 north and route 50 south is approximately the same, making either bridge equally available and convenient for the use of interstate traffic over highway route No. 50.

It is alleged in the bill, and admitted by the motion to dismiss, that heretofore these bridges have been highly competitive; that their toll rates were approximately the same, and each received a fair share of through traffic; that it has been advantageous for through traffic to use the Clarksburg bridge rather than the Parkersburg bridge because of the traffic congestion in the area around the city of Parkersburg; that the Clarksburg bridge is better equipped for the handling of traffic; that it was erected at a cost of $1,250,000 and depends for its revenue almost entirely on through traffic, there being little local traffic between St. Mary's, West Virginia, and Newport, Ohio; that the Parkersburg bridge carries a large amount of local traffic between Parkersburg, W. Va., and Belpre, Ohio, and is not dependent for its revenues upon through traffic, the local traffic on the Parkersburg bridge being greater than the entire traffic, both through and local, over plaintiff company's bridge.

It is further alleged that in June, 1935, "without notice to the plaintiff corporation, and without an opportunity for it to be heard, or to present evidence of the competitive conditions aforesaid, and of the irreparable loss and damage which would result to it, by reason of a reduction in the tolls charged upon the bridge of the defendant corporation," the Secretary of War ordered a reduction of approximately 35 per cent. in the toll rates of the Parkersburg bridge, effective January 1, 1936; that the Secretary refused to consider any circumstances in determining the toll rate to be charged upon the Parkersburg bridge except that of a reasonable return upon the investment in that bridge; that he did not consider the relative effect upon other competing bridges; that plaintiff had no notice of the investigation and had no opportunity to appear

and show the competitive situation which existed; that thereafter, but before the order became effective, plaintiff, without avail, appealed to the Secretary for a hearing and protested the denial of its right to notice and to appear and be heard.

It is further alleged that as a result of this reduction traffic has been diverted to the Parkersburg bridge, and although the 35 per cent. reduction in toll rates has been in effect since January 1, 1936, the gross operating revenues of the Parkersburg bridge have decreased only 19 per cent.; that unless restrained, the Parkersburg bridge will shortly be receiving an even larger gross revenue than it enjoyed prior to the reduction of rates, due to the diversion of traffic to it; that because of this reduction, traffic will use the Parkersburg bridge in preference to plaintiff's bridge, "to the irreparable loss, injury, and damage" of plaintiff.

It is further alleged that plaintiff company is not now earning sufficient, due to the competition brought about by the reduced rates charged by the Parkersburg Bridge Company, to pay in full the interest on its bonded indebtedness, but can only pay one-half thereof; that if relief is not granted, it must reduce its tolls or cease operation, "to the irreparable loss and injury not only of the communities which it serves, but of its stockholders, bondholders, and creditors"; that the action of the Secretary in reducing the rates on the Parkersburg bridge and in refusing plaintiff company an opportunity to be heard, was illegal, arbitrary, and capricious, and constituted a confiscation of plaintiff's property without due process of law; and that the toll rates in force on the respective bridges prior to this reduction were reasonable and just.

Defendant Parkersburg Company filed an answer in which it admitted practically all the averments of the bill, stated that the reduction was unwarranted, and that it had consistently objected to the reduction of its tolls, consented to the granting of a preliminary injunction, and held itself ready to reinstate its former toll rates and to impound in cash the difference between the present and former toll rates.

The Secretary moved to dismiss the bill upon the grounds: (1) That plaintiff is without standing to maintain this suit; (2) that the bill states no cause of action and is wanting in equity; (3) that the bill alleges no legal injury by reason of the Secretary's action. From the decree sustaining the Secretary's motion and dismissing the bill, this appeal was taken. No appearance was entered for the appellee Parkersburg-Community Bridge Company in this court.

Both bridge companies are subject to the lawful orders of the Secretary of War prescribing toll rates under the Act of Congress of March 23, 1906, § 4, 34 Stat. 85 (section 494, T. 33, U.S.C. [33 U.S.C. A. § 494]), which, among other things, provides: "If tolls shall be charged for the transit over any bridge constructed under the provisions of this chapter, sections 491 to 498, inclusive, of engines, cars, street cars, wagons, carriages, vehicles, animals, foot passengers, or other passengers, such tolls shall be reasonable and just, and the Secretary of War may, at any time, and from time to time, prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit."

■■ The right to notice and hearing is imperative in judicial or quasi judicial proceedings. It is not important that in this instance a hearing is not expressly enjoined by the statute. The right is constitutional, and the deprivation of the citizen of his property without notice and an opportunity to be heard amounts to the taking of his property without due process of law (Const. Amend. 5). In the very recent case of Morgan et al. v. United States, 298 U.S. 468, 56 S.Ct. 906, 908, 80 L.Ed. 1288, the court was considering an order of the Secretary of Agriculture fixing maximum rates to be charged by market agencies in buying and selling live stock in the Kansas City stock yards. The complainants, among other things, claimed that they had been deprived of the full hearing required by the statute. The court, reversing the lower court ([D.C.] 8 F.Supp. 766) chiefly on this point, said: "We meet at the threshold of the controversy plaintiffs' additional contention that they have not been accorded the hearing which the statute requires. They rightly assert that the granting of that hearing is a prerequisite to the making of a valid order. * * * But, in determining whether in conducting an administrative proceeding of this

sort the Secretary has complied with the statutory prerequisites, the recitals of his procedure cannot be regarded as conclusive. Otherwise the statutory conditions could be set at naught by mere assertion. If upon the facts alleged the 'full hearing' required by the statute was not given, plaintiffs were entitled to prove the facts and have the Secretary's order set aside. Nor is it necessary to go beyond the terms of the statute in order to consider the constitutional requirement of due process as to notice and hearing. For the statute itself demands a full hearing, and the order is void if such a hearing was denied. * * * The proceeding is not one of ordinary administration, conformable to the standards governing duties of a purely executive character. It is a proceeding looking to legislative action in the fixing of rates of market agencies. And, while the order is legislative and gives to the proceeding its distinctive character (Louisville & Nashville R. Co. v. Garrett, 231 U.S. 298, 307, 34 S.Ct. 48, 58 L.Ed. 229), it is a proceeding which by virtue of the authority conferred has special attributes. The Secretary, as the agent of Congress in making the rates, must make them in accordance with the standards and under the limitations which Congress has prescribed. Congress has required the Secretary to determine, as a condition of his action, that the existing rates are or will be 'unjust, unreasonable, or discriminatory.' If and when he so finds he may 'determine and prescribe' what shall be the just and reasonable rate, or the maximum or minimum rate, thereafter to be charged. That duty is widely different from ordinary executive action. It is a duty which carries with it fundamental procedural requirements. There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact. Nothing can be treated as evidence which is not introduced as such. United States v. Abilene & Southern Ry. Co. [265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016], supra. Facts and circumstances which ought to be considered must not be excluded. Facts and circumstances must not be considered which should not legally influence the conclusion. Findings based on the evidence must embrace the basic facts which are needed to sustain the order."

■ In the present situation, considering the sharp competitive conditions existing between the two companies here involved, it was impossible for the Secretary to arrive at a decision fixing "just and reasonable" tolls in the absence of complete and full testimony as to all the conditions bearing upon the rights of these respective parties. As suggested, the procedure is judicial and all the attributes of a judicial proceeding should be observed in order to arrive at a just and equitable conclusion.

■ The statute here is unique. Although it has been in force for thirty years, our attention has not been directed to any reported case in which the Secretary of War has heretofore attempted to exercise the rate-making power conferred upon him by the statute. This is therefore a case of first impression. The Secretary under the statute is vested with most drastic power, and this of itself imposes the necessary requirements for the protection of the rights of all interested parties, and the duty of bringing said parties into the investigation by due notice and a full opportunity to be heard.

■ It will be observed that while the statute requires the Secretary to fix toll rates that are "just and reasonable," it provides no procedure to guide the Secretary in determining what are just and reasonable rates. We are of opinion, however, that this does not vest in the Secretary arbitrary power to fix toll rates without giving parties affected thereby an opportunity to be heard, nor does it relieve the Secretary from considering such important matters as the competitive rights of complaining parties, their right to a full hearing, and all matters proper to be taken into consideration in fixing rates. The powers conferred upon him by the statute are both legislative and judicial in their nature and must be exercised in a manner that will do justice to all parties concerned.

A close analogy is found in the rate-making power conferred upon the Interstate Commerce Commission with respect to rail carriers. Both the Commission and the Secretary are empowered by the respective statutes conferring their jurisdiction to fix just and reasonable rates. The bridges of the respective parties to this action cross the Ohio river, the state line between West Virginia and Ohio, and the traffic over these bridges makes them as much public utilities as are railroads. The

792

interest of the public in their efficient management is just as great, and competition plays just as vital a part in the conduct of their affairs. We think, therefore, that the fundamental principles underlying the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.), as they appear from the act itself and from its judicial interpretations, may be considered in arriving at a just determination of the extent of the judicial power vested in the Secretary of War in establishing toll rates under the act vesting him with this authority.

The Secretary first defends on the ground that plaintiff company has not sufficient interest to entitle it to maintain this suit, since it can show no legal injury as a result of the lowering of the toll rates on the Parkersburg bridge. We think from the averments of the bill, which are admitted, that the vital interest of the Clarksburg Company in this controversy is not open to question. It appears, if the plaintiff company is to continue business, that in order to compete for traffic it will be compelled to reduce its tolls to the rates fixed by the Secretary for the Parkersburg bridge, and this it cannot afford to do and meet its obligations for the payment of interest to its bondholders. But the Secretary answers that this damage is merely the result of competition, and not a legal injury. This answer might be supported if the competition were merely between bridge companies not subject to government regulation. Under such circumstances, one of the companies might, of its own volition, reduce its rates to an extent that would destroy the business of the other company, but there would be no such legal injury as would justify the interposition of equity, since the complaining party would merely suffer damage incident to unrestricted competition; but in the present situation the Secretary is specifically enjoined by statute to fix toll rates on these bridges which shall be "reasonable and just."

We have here a situation where Congress has granted to these companies rights, which could not otherwise have been acquired, to construct these bridges, and has specifically prescribed the conditions under which they shall be maintained and operated. We have, therefore, in these bridges, public utilities subject to a rate-making power, and appellant company

has shown a vital interest, which we think entitled it to a hearing by the Secretary.

Closely analogous to the present case is that of Baltimore & Ohio R. Co. v. United States, 264 U.S. 258, 44 S.Ct. 317, 318, 68 L.Ed. 667, where the court was considering an attempt on the part of the New York Central Railroad Company, acting under an order of the Interstate Commerce Commission, to control the operation of the Chicago belt line road, in disregard of the interests of the competing lines of railway which had been afforded facilities over the belt lines. The trial court had denied the carriers' bill for injunction and dismissed it, chiefly upon the ground of their inability to establish such an interest as would entitle them to equitable relief. The court said: "The defendants, besides asserting its validity, insist that the plaintiffs have no interest which entitles them to assail the order. * * * Whether this order can be described properly as legislative may be doubted. It is clear that legislative character alone would not preclude judicial review. Rate orders are clearly legislative. * * * The order here challenged is wholly unlike those which have been held not subject to judicial review. * * * To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action. * * * The defendants contend that the plaintiffs have not the legal interest necessary to entitle them to challenge the order. That they have in fact a vital interest is admitted. They are the competitors of the New York Central. Practically all the tonnage originated at or destined to points on these terminal railroads is competitive, in that the same can be hauled either over the lines of the New York Central or over those of the plaintiffs. Prior to the date of the order, and while the terminal railroads were uncontrolled by any trunk line carrier, they were all served impartially and without discrimination, and they competed for the traffic on equal terms. The order substitutes for neutral control of the terminal railroads, monopoly of control in the New York Central, and, in so doing, necessarily gives to it substantial advantage over all its competitors and subjects the latter to serious disadvantage and prejudice."

When this investigation was instituted, the Secretary was confronted with the peculiar situation here involved. Two

bridges, located in close proximity, over both of which his jurisdiction extended, carried interstate traffic over branches of a single highway and the sharpest competition existed as to the portion of the traffic each should receive. There are many circumstances which may be conceived of as having a vital bearing upon the fixing of just and reasonable rates. It is pointed out that, due to the heavy local traffic over the Parkersburg bridge between Parkersburg and Belpre, a reduction in the local rates could have been made, without changing the through rates, so as to reduce the revenues of the Parkersburg Company and give it a reasonable return upon its investment, without interfering in any way with the rights of the Clarksburg Company. This fact alone was of sufficient importance to have at least called for a hearing by the Secretary of the plaintiff company.

We think, however, that the underlying consideration which confronted the Secretary was the competitive situation here involved. Reverting again to the analogous situation of railroads and the Interstate Commerce Commission, we find that competition is regarded as one of the most important factors in rate making. In Interstate Commerce Commission v. Chicago Great Western Ry. Co. (C.C.) 141 F. 1003, 1015, affirmed 209 U.S. 108, 28 S.Ct. 493, 52 L.Ed. 705, the court said: "A careful examination of the opinions * * * shows that there are a great many factors and circumstances to be considered in fixing a rate * * * among other things: * * * (6) Competition, which the authorities, as well as the experts, in their testimony in these cases, recognize as a very important factor."

In Texas & P. Ry. Co. v. Gulf, etc., Ry. Co., 270 U.S. 266, 277, 46 S.Ct. 263, 266, 70 L.Ed. 578, in construing the Transportation Act of 1920, the court said: "By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized * * * that competition between carriers may result in harm to the public, as well as in benefit; and that, when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss."

We think the public has a vital interest in having both of these utilities maintained in an efficient manner to meet the demands of traffic. If, as alleged, plaintiff company cannot keep its bridge in operation under the reduced competitive rate established by the Secretary, it requires no stretch of imagination to foresee the damage which will be sustained by the public, not only in the use of highway 50, but in the use of other highways converging and crossing the Ohio river at the points where these two bridges are located. All of these matters confronted the Secretary in fixing a just and reasonable competitive rate as between the respective bridges. An arbitrary rate, that, under the circumstances which were considered, might furnish a just rate upon the investment of the Parkersburg Bridge Company, might prove confiscatory of the property of plaintiff company, since its bridge was of a more modern type and cost much more than the Parkersburg bridge. Plaintiff company's investment, therefore, being so much greater than that of the Parkersburg Company, was a matter of paramount importance to be considered in fixing a just and reasonable competitive rate.

These are all matters properly to be taken into consideration in fixing just and reasonable rates. The equitable rule followed by the Interstate Commerce Commission is announced in the case of Commercial Club of Salt Lake v. Atchison, T. & S. F. Ry. Co., 19 I.C.C. 218, as follows: "In determining a freight rate which must of necessity be charged by competing lines, [the Commission] would not look exclusively to that line which could handle the business the cheapest or which was the strongest financially, but would consider as well the weaker rival."

In other words, in the fixing of rates the authority exercising this power must always proceed upon the well-settled principles of law and equity and not upon mere arbitrary discretion (Canada Northern Ry. Co. v. International Bridge Co. [D.C.] 7 F. 653), and the existence of competition is fundamental and should always be considered in rate making. Indeed, under the authorities it is an established principle that in these cases competition may be a controlling factor. Interstate Commerce Commission v. Chicago, G. W. Ry. Co. (C.C.) 141 F. 1003; Id., 209 U. S. 108, 28 S.Ct. 493, 52 L.Ed. 705.

According to the decisions, the just and reasonable rate sought in rate-making for railroads is not the rate at which

the most cheaply operated road is run, nor the rate at which the road with most costly operation is run, but rather the rate at which the average road can be successfully operated, thus enabling the great and intricate system of railroads successfully to carry the commerce and traffic of the Nation.

Under modern conditions, there has grown up a vast and ever expanding network of highways, extending from one end of the country to the other, over which commerce and traffic flow by motor lines and upon the development of which federal and state governments are expending millions of dollars. The extent to which interstate commerce is carried on over these lines of highway has so threatened the ability of the railroads to maintain themselves against this competition that Congress has recently found it necessary to place the operators of this commerce under the control of the Interstate Commerce Commission. Motor Carrier Act of 1935, approved August 9, 1935 (49 U. S.C.A. § 301 et seq.).

We think that the fixing of just and reasonable rates, whether it be for motor carriers moving over these highways, or for structures, such as bridges, which constitute integral parts of such highways, should be governed by the same principles which control rate-making for railway traffic.

If the failure of the Secretary to notify plaintiff company of the investigation about to be made in fixing the rates to be charged by the Parkersburg Bridge Company was an oversight on his part, ample opportunity to correct the mistake was afforded from the fact that between the time the order was made and the date it was to go into effect six months elapsed, and it was during that period that appellant company first received notice of the proposed change in rates and applied to the Secretary for a reopening of the case and for permission to be heard.

We think the lower court was in error in holding that the Secretary was not required to consider the effect of the new rates "upon another bridge 20 miles distant." This loses sight of the fact that these two bridges are integral parts of a single transcontinental highway, the branches thereof dividing east of the bridges and converging again west of the bridges, thus dividing the traffic, as the public may find convenient, between the two bridges in question. It is difficult to imagine a case where a rate reduction on one instrumentality of commerce more directly affects another than in the case here presented.

The decree is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

STEPHENS, Associate Justice (dissenting).

The majority opinion as I understand it rules that under the statute (Act of March 23, 1906, § 4, 34 Stat. 85, 33 U. S.C. § 494 [33 U.S.C.A. § 494]) the Secretary of War, in prescribing "reasonable and just" toll rates for the appellee's bridge, must take into consideration not merely reasonable return on investment for that bridge but also the effect of the rates for that bridge to divert traffic from, and therefore to reduce the revenues of, the appellant's bridge.

To rule that the appellant was constitutionally entitled to notice and hearing notwithstanding the absence of provision therefor in the statute I think begs the principal question in the case, which is whether the appellant has any legal right to insist that the Secretary, in prescribing rates for appellee's bridge, consider their effect upon appellant's bridge. If the appellant has such a right, it must get it under the statute rather than under the constitution, for the latter does not guarantee such rates for one bridge as will cause a competing bridge to be profitable to its stockholders or to remain a going concern. The statute in terms says nothing of consideration of competitive effects. The Interstate Commerce Act and the decisions thereunder, especially those since 1920, are hardly a dependable guide to a decision here because Congress expressly introduced into the Interstate Commerce Act by the Transportation Act of 1920 (41 Stat. 456, 474–499; 49 U.S.C. § 15a [49 U.S.C.A. § 15a]) the concept, as a factor in prescribing just and reasonable rates, of fair return for "carriers as a whole . . . under honest, efficient and economical management . . ." The Emergency Railroad Transportation Act of 1933 (48 Stat. 211, 220, § 205; 49 U.S.C. § 15a [49 U.S.C.A. § 15a]) retained this concept and made it more specific by requiring the Commission, in the exercise of its power to prescribe "just and

reasonable" rates, to "give due consideration, among other factors, to the effect of rates on the movement of traffic; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service." Such cases as the New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605, and Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L. Ed. 371, 22 A.L.R. 1086, made clear that this was a new concept in rate making. In Texas & Pac. Ry. Co. v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578, the Supreme Court expressly recognized the introduction by Congress of this rate making concept. Speaking through Mr. Justice Brandeis, the Court said, in specific reference to the Transportation Act of 1920:

"By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public as well as in benefit; and that when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss." [270 U.S. at page 277, 46 S.Ct. 263, 70 L.Ed. 578]

The statute involved in the instant case has, since the date of its passage in 1906, significantly remained unamended. Congress has added no such rate making concept to it. I bear in mind that it is arguable that a legislature in using the word "reasonable" in a statute passed many years ago may have intended that word to gain meaning from the accretions of time and experience, but this view can hardly have weight where, as here, the statute in question remains unamended while new concepts are expressly embodied in another rate making act.

The Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667, especially relied upon in the majority opinion for the proposition that the appellant had a right to notice and hearing is I think not in point. That portion of the opinion in that case quoted in the majority opinion herein discusses not the legal interest of the parties but their practical or "vital" interest. As I read the case the real basis of the ruling that the plaintiffs might properly challenge the order of the Interstate Commerce Commission which was involved is that they were parties to that order and therefore had a right to be heard in the judicial proceeding under the express provisions of the Judicial Code, §§ 212, 213 (originally the Commerce Court Act, June 18, 1910, c. 309, § 5, 36 Stat. 543, 28 U.S.C. § 45a [28 U.S.C.A. § 45a]), declaring that any party to a proceeding before the Commission may, as of right, become a party to "any suit wherein is involved the validity of such order." The case of Interstate Commerce Commission v. Chicago G. W. Ry., 209 U.S. 108, 28 S.Ct. 493, 52 L.Ed. 705, especially relied upon in the majority opinion in support of the asserted substantive right of the appellant to insist that the Secretary of War, in prescribing rates, consider their effect upon appellant's bridge, is a case decided under section 3 of the Interstate Commerce Act (49 U.S.C.A. § 3), which section makes it unlawful for carriers to subject any particular person or locality or any particular description of traffic to undue or unreasonable prejudice or disadvantage. There is no such provision in the statute involved in the instant case.

The majority opinion, I think, reads into the statute a concept which is not there. Conceivably Congress should require the same factors to be considered in respect of bridge rates as are now by the Interstate Commerce Act required to be considered in respect of railroad rates —although it is to be borne in mind that the Interstate Commerce Commission has vast powers of a supervisory and regulatory nature over carriers which have not been given the Secretary of War and which may well warrant rate making for railroads on a basis which regards competitive conditions and effects in respect of all carriers. I refer particularly to the power of the Commission to grant and refuse certificates of convenience and necessity and thereby to forbid the building

of unnecessary lines. But in any event what *ought* to be the powers of the Secretary of War over bridges and what *ought* to be the specific factors which it is his duty to consider in making rates for them are for Congress to determine, not for us.

I think the statute imposes no duty upon the Secretary to consider competitive effects and hence confers no substantive and therefore no adjective rights upon the appellant. This was apparently the view of the trial court, and I think its judgment should be affirmed.