MORGAN et al. v. UNITED STATES et al.
No. 2328 and Related Cases Nos. 2329–2378.

District Court, W. D. Missouri, W. D.
April 9, 1940.

John B. Gage, of Kansas City, Mo. (Frederick H. Wood and Thomas T. Cooke, both of New York City, and Carson E. Cowherd, of Kansas City, Mo., on the brief), for petitioners.

Wendell Berge and Hugh B. Cox, Sp. Assts. to Atty. Gen. (James C. Wilson,. Sp. Asst. to Atty. Gen., S. R. Brittingham, Jr., Sp. Atty., of Norfolk, Va., Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., and Mastin G. White, Sol., Department of Agriculture, and G. N. Dagger, Atty., Department of Agriculture, both of Washington, D. C., on the brief), for the United States and the Secretary of Agriculture.

Homer H. Berger and Douglas Stripp, both of Kansas City, Mo. (Morrison, Nugent, Berger, Byers & Johns, of Kansas City, Mo., on the brief), for New Amsterdam Casualty Co.

Before VAN VALKENBURGH, Circuit Judge, and REEVES and OTIS, District Judges.

VAN VALKENBURGH, Circuit Judge.

This is the third time this case has come before this court, and a better understanding of the issues now presented requires a recapitulation of the successive steps of the litigation in this court and in the Supreme Court of the United States.

The proceeding was instituted by an order of the Secretary of Agriculture in April 1930. An order presenting rates followed in May 1932. Upon rehearing, granted in July 1932, a new order was made on June 14, 1933. The order of June 14, 1933, was attacked in this court, so far as it prescribed maximum charges for selling livestock, as illegal, arbitrary, and as depriving the plaintiff commission men of their property without due process of law.

The outstanding allegation in the bill, in support of the contention that the order was null and void because plaintiffs had been denied a fair and full hearing, was the charge set forth in paragraph IV that the Secretary had delegated to assistants, purporting to be acting Secretaries of Agriculture, powers and authorities vested by the Packers and Stockyards Act, 7 U.S.C. A. § 181 et seq., solely in the Secretary. That the hearings, such as were granted, were held before such subordinates, who made the findings and conclusions incorporated in said order. That the secretary himself signed the order, but that his sole information with respect to the proceeding was derived from consultation with employees for the Department of Agriculture, largely out of the presence of plaintiffs or their representatives.

Counsel for the secretary moved to strike the paragraph from the bills on the ground that this was a purely departmental administrative proceeding, and this court improvidently indulged that contention and sustained the motion to strike. Subsequently, under misconception of the limitations imposed upon the review of such proceedings, the order was sustained and the bills of complaint were dismissed. D.C., 8 F. Supp. 766.

On appeal to the Supreme Court the decree of this court was reversed and some very pertinent and instructive rulings were made with respect to proceedings under the Packers and Stockyards Act. Morgan v. United States, et al., 298 U.S. 468, 56 S.Ct. 906, 911, 80 L.Ed. 1288. It was there held that:

There is "no basis for the contention that the authority conferred by section 310 of

the Packers and Stockyards Act [7 U.S.C. A. § 211] is given to the Department of Agriculture, as a department in the administrative sense. * * *

"The proceeding is not one of ordinary administration, conformable to the standards governing duties of a purely executive character. It is a proceeding looking to legislative action in the fixing of rates of market agencies. * * *

"A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. * * *

"To give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them. That duty undoubtedly may be an onerous one, but the performance of it in a substantial manner is inseparable from the exercise of the important authority conferred. * * *

"Facts and circumstances must not be considered which should not legally influence the conclusion. * * *

"In determining whether in conducting an administrative proceeding of this sort the Secretary has complied with the statutory prerequisites, the recitals of his procedure cannot be regarded as conclusive. Otherwise the statutory conditions could be set at naught by mere assertion. If upon the facts alleged the 'full hearing' required by the statute was not given, plaintiffs were entitled to prove the facts and have the Secretary's order set aside."

The conclusion was that the district court erred in striking out the allegations of Paragraph IV of the bills of complaint. The decree was reversed and the cause remanded with directions that the defendants therein should be required to answer the allegations contained in that paragraph, and that the question whether plaintiffs had had a proper hearing should be determined.

At the next hearing before this court, constituted as at present, the majority reached the conclusion that the secretary gave plaintiffs that hearing to which the law entitled them, and entered a decree dismissing the bills. Morgan v. United States, D.C., 23 F.Supp. 380, 384. The writer was unable to concur in that conclu-

sion, and the reason for dissent was epitomized in the following language: "It is impossible, in my judgment, to read the testimony of the Secretary without recognizing that he carried into the final determination reached this conception of the proceeding as one belonging to his department in an administrative sense. The examinations he made were casual and perfunctory in the extreme. He says his final determination represented his reactions to the findings of the men in the Bureau of Animal Industry. He accepted these findings because he regarded his subordinates as in a better position than himself to make the decision. In his view 'the phrase "Secretary of Agriculture" is perhaps used in connections with regard to laws of this sort in the broad sense as well as in the narrow sense'."

On appeal to the Supreme Court the decree was again reversed and the order of the Secretary held void for failure to allow the full hearing before the Secretary required by the Packers and Stockyards Act. 304 U.S. 1, 58 S.Ct. 773, 999, 82 L. Ed. 1129.

The Secretary of Agriculture at the outset was firmly of the opinion that the authority conferred by section 310 of that Act is given to the Department of Agriculture as a department in the administrative sense. Despite the holding of the Supreme Court in the first Morgan case that there is no basis for this contention (298 U.S. loc. cit. 481, 56 S.Ct. 906, 80 L.Ed. 1288), he in effect still adhered to this view, as witness his deposition taken in the former hearing, in which, having been referred to as the "ratemaker" under the terms of the Act, he said: "Yes, that is correct. I would think, however, that the phrase 'Secretary of Agriculture' is perhaps used in connections with regard to laws of this sort in the broad sense as well as the narrow sense."

In the second Morgan opinion, 304 U.S. loc. cit. 18, 58 S.Ct. loc. cit. 776, 82 L.Ed. 1129, the court said:

"The substance of his action is stated in his answer to the question whether the order represented his independent conclusion, as follows:

" 'My answer to the question would be that that very definitely was my independent conclusion as based on the findings of the men in the Bureau of Animal Industry. I would say, I will try to put it as accurately as possible, that it represented my

own independent reactions to the findings of the men in the Bureau of Animal Industry.'

"Save for certain rate alterations, he 'accepted the findings.'"

The following language of that opinion, 304 U.S. loc.cit. 20, 21, 58 S.Ct. loc.cit. 777, 82 L.Ed. 1129, has especial pertinency to the inquiry now before us:

"The requirements of fairness are not exhausted in the taking or consideration of evidence, but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps.

"The answer that the proceeding before the Secretary was not of an adversary character, as it was not upon complaint but was initiated as a general inquiry, is futile. It has regard to the mere form of the proceeding and ignores realities. In all substantial respects, the Government acting through the Bureau of Animal Industry of the Department was prosecuting the proceeding against the owners of the market agencies. The proceeding had all the essential elements of contested litigation, with the Government and its counsel on the one side and the appellants and their counsel on the other. It is idle to say that this was not a proceeding in reality against the appellants when the very existence of their agencies was put in jeopardy. Upon the rates for their services the owners depended for their livelihood, and the proceeding attacked them at a vital spot. This is well shown by the fact that, on the merits, appellants are here contending that under the Secretary's order many of these agencies, although not found to be inefficient or wasteful, will be left with deficits instead of reasonable compensation for their services, and will be compelled to go out of business. And to this the Government responds that if as a result of the prescribed rates some agencies may be unable to continue, because through existing competition there are too many, that fact will not invalidate the order. While we are not now dealing with the merits, the breadth of the Secretary's discretion under our rulings applicable to such a proceeding, Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Acker v. United States, 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257, places in a strong light the necessity of maintaining the essentials of a full and fair hearing, with the right of the appellants to have a reasonable opportunity to know the claims advanced against them as shown by the findings proposed by the Bureau of Animal Industry".

The holding was that, as the hearing was fatally defective, the order of the Secretary was invalid. An effort to establish a case for rehearing was rejected, and the case was remanded to the district court for further proceedings in conformity with the opinion rendered.

On July 22, 1933, as a condition of the interlocutory stay order granted to petitioners in their attack upon the validity of the Secretary's rate order of June 14, 1933, this court ordered the payment into court by petitioners of the difference between the rates established by tariffs of petitioners published prior to June 14, 1933, and the lower rates fixed by the Secretary's order of the latter date. This deposit was conditioned to await the outcome of the litigation then pending. These deposits made with the clerk of the District Court between July 22, 1933, and November 1, 1937, aggregated the sum of $586,093.32. On this last named date new advanced rate schedules for petitioners became effective by consent. United States v. Morgan, et al., 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129, was finally decided May 31, 1938, and on June 7, 1938, defendants filed in this court a motion for an order staying the distribution of these monies, alleging that the Secretary had reopened the proceeding in which the invalid order of June 14, 1933, was entered; that the Secretary would determine by an order, as of June 14, 1933, what rates may reasonably be charged by petitioners to their clients for services rendered, thereby assuring that said monies would be disposed of with equity and law. June 11, 1938, petitioners filed answer to this motion, and a petition for restitution to them of the impounded funds. July 2, 1938, this court overruled defendants' motion and sustained petitioners' application for restitution. See D.C., 24 F.Supp. 214. On appeal, the Supreme Court reversed the latter order of this court, holding that, in arresting excess payments under schedule rates this court acted as a court of equity, "charged both with the responsibility of protecting the fund and of disposing of it according to law, and free in the discharge of that duty, to use broad discretion in the exercise of its powers in such manner as to avoid an unjust or unlawful result". United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 801, 83 L.Ed. 1211.

550

In the reopened proceeding the Secretary, upon June 20, 1939, has entered a new order holding that the rates and charges collected during the period between July 22, 1933, and November 1, 1937, were unjust and unreasonable and prescribing, as just and reasonable, the identical rates prescribed in the invalid order of June 14, 1933. A motion of respondents prays the court to require petitioners to show cause, if any, why such order does not constitute an appropriate basis for the distribution of said funds now in the registry of this court. In response to this motion petitioners filed a return praying that the motion of respondents herein be denied and that the moneys deposited in the registry of the court be distributed to petitioners. In support of this prayer many specifications of error and irregularity are assigned.

The first, and perhaps the foremost, of these, is the charge that the market agencies were denied the fair hearing required by the due process clause and were denied an impartial tribunal as the trier of the facts. The Secretary overruled petitioners' motion and affidavit of bias and prejudice filed August 12, 1938, and their motion to suppress the Report and Recommendations of the trial examiner filed February 17, 1939.

An examination of the opinion of the Supreme Court in previous appeals discloses that the June 14, 1933, order of the Secretary had been held invalid because a full and fair hearing had not been accorded to petitioners, because the Secretary had not addressed himself to the evidence and upon that evidence had conscientiously reached the conclusions deemed to justify them, but, on the contrary, had accepted, and adopted as his own, findings made by subordinates in the Bureau of Animal Industry who were the real prosecutors of these proceedings against the owners of these market agencies—proceedings in which "the very existence of their agencies were put in jeopardy". In support of their charge of bias and prejudice, which, in this case, consists of an alleged preconceived conviction, concerning the issue involved, petitioners put in evidence a letter of the Secretary to the New York Times in regard to this impounded fund. This letter was sent on May 8, 1938, which was between the date of the Supreme Court's decree, invalidating his order, and the handing down of its opinion denying a rehearing. In this letter the Secretary displays impatient disapproval of the Supreme Court's action, and, in effect, brings an appeal from it to the bar of public opinion. He insists, despite that ruling, that this impounded fund (which he mistakenly places at $700,000) rightfully belongs to the farmers, of which, he says, they had been deprived "by some finely-drawn rules of judicial procedure." The letter emphasizes his fixed opinion that this money should be distributed to the shippers of livestock, notwithstanding he interpreted the Supreme Court's decree to the contrary. By this letter he publicly announced his determination and prejudgment of what the result of any future proceeding should be. His reopening order was dated June 2, 1938, and as the first step in the proceeding he presented the former invalidated proceedings, findings of fact, conclusions and order as tentative findings. He permitted the filing of exceptions thereto, and designated the same examiner to hear additional evidence. Thereafter the Secretary himself heard oral argument in March 1939. By the government no additional evidence was introduced. It is clear, from the record presented to this court, that the object of the Secretary, through this reopened hearing, was to procure the validation nunc pro tunc of the fatally defective order of June 14, 1933. His conception was that the only error found by the Supreme Court in the prior proceeding which led to the invalidation of that order was the failure to permit a full argument on these findings and conclusions with full understanding of the issues presented.

These findings, however, had been made by representatives of the Bureau of Animal Industry, who had been found to be active prosecutors for the government in this contested litigation, and had been made upon evidence to which the Secretary had not addressed himself in the sense contemplated by the Act. Moreover, the rates and charges prescribed in the invalidated order were rates prescribed for future observance, and were not based upon actual experience.

By the terms of Section 310 of the Act, 7 U.S.C.A. § 211, it is provided that the Secretary may, after full and fair hearing, determine and prescribe what will be the just and reasonable rates or charges to be thereafter observed. In other words, such an order is necessarily a forecast and is to be judged solely by the conditions existing. That order has been declared invalid, and neither it nor the findings, made

or purported to have been made as a result of the discredited proceedings, are entitled to weight in the inquiry now before us. This is a proceeding in equity to determine to whom the impounded fund should be distributed, and the decision depends upon a determination of the reasonableness of those rates in the light of actual experience instead of prophecy. The invalidated order and the so-called findings upon which it was based have no standing as proper bases of this inquiry. The secretary upon reopening the case assumed the burden of determining that the money would be disposed of "in accordance with equity and law". He introduced no new evidence in support of this burden, but contented himself with dependence upon the previous invalid order and findings as a basis. He was apparently of opinion that a perfunctory argument on this basis would rehabilitate the rates prescribed as of June 14, 1933.

We have before us, as had the Secretary not only proof that the rates prescribed June 14, 1933, were not reasonable, but also that at the time of this reopened hearing "it is now possible as it has never been before, to determine just and reasonable rates and to prove them to be such beyond question". This information is gathered from a "Memorandum for the Secretary" presented to him on June 13, 1939 (just one week before the order of June 20, 1939), by C. A. Kitchen, Associate Chief of the Bureau of Animal Industry. This memorandum, while too lengthy for incorporation in this writing contains matter of crucial importance, and is of itself sufficient to condemn the order under consideration as a basis in equity for the distribution of the impounded fund.

We refer only briefly to some of the important statements. He recites that he has read the proposed order in Docket 311, and certain questions have occurred to him which he submits to the Secretary for consideration. A first observation is that "the proposed order does not modify the rates set out in your order of June 14, 1933", although "the structure of the rates in your order of June 14, 1933, and in the proposed order may be open to criticism in certain particulars".

He especially thinks the rate for so-called yearling cattle should be brought to the attention of the secretary. He states in this connection that the reduction made by the order of June 14, 1933, was most pronounced in the rates applying to year-ling cattle, and that this appears to be the vulnerable point in that, and this, rate structure. Cattle of the class defined in the order as yearling cattle make up, as he says, a large proportion of the cattle received in the Kansas City market. He suggests that the conditions which prompted the modification order of November 1, 1937, did not suddenly come into being on that date, but it was reasonable to assume that they had obtained for sometime prior thereto, and the charges made in the cattle tariff are prima facie recognition of the fact that the rates of June 14, 1933, which are confirmed by the proposed order, were not reasonable for the entire period during which the funds were impounded. He clearly suggests that the severe reduction in the rates for yearling cattle in this and the order of June 14, 1933, especially is without justification, and forecasts that "the Department may be subject to criticism for having acted in an arbitrary manner". Of great significance is the statement that "it is now possible, as it has never been before, to determine just and reasonable rates and to prove them to be such beyond question"; that, "in effect such a determination must have been made as a basis for the modification of November 1, 1937".

The Secretary testifies (record 98) that he read this memorandum. He made no changes in his findings and did not act in any way in reliance upon this memorandum in connection with this proceeding. This attitude accords with the treatment received by petitioners who, both at the original hearing, and in this later one, consistently urged virtually the same matters upon the Secretary and examiner, but without success. The order as made ignored the pertinent suggestions of Mr. Kitchen, who at this time has taken over the administration of the Packers and Stockyards Act which formerly was in the Bureau of Animal Industry.

In our judgment the Kitchen memorandum, ignored by the Secretary, as he says, standing alone, but certainly in connection with the offers of proof by petitioners, proves conclusively that no effort was made to ascertain the actual reasonableness of rates during the impounding period, although it was then possible to determine them from actual experience instead of from hypothesis and forecast. On the contrary it confirms the fact that the object of the Secretary, and of those in the department by whom these rates were originated, was to validate the rates prescribed by the

552

invalid order of June 14, 1933. In our judgment also it establishes the fact that by reason of a preconceived and fixed erroneous conception of the authority conferred upon him by the Packers and Stockyards Act, the Secretary denied to petitioners the fair hearing required by the due process clause before an impartial tribunal as the trier of the fact.

■ We are to remember that in the discharge of our duties and responsibilities as a Court of Equity, we are enjoined to use broad discretion in the exercise of equitable powers in such manner as to avoid an unjust or unlawful result.

■ The Secretary seems to regard the permission to obtain the aid of assistants in the department, who may "sift and analyze" evidence taken by an examiner, to confer upon him the right without more to accept and adopt the views of such subordinates, who are, in most cases, as in this, the actual prosecutors against the market agencies. There must, however, be a hearing in a substantial sense. Sifting and analyzing by others is not enough. "To give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them." This, the Secretary did not do, as appears from his testimony here. The following statement is typical of the manner in which he examined and appraised the testimony tendered by petitioners in support of their proposed findings and their exceptions to the Master's report: "It is my recollection that Mr. Brooke's (the examiner) conclusion in hearing Mr. Bates' testimony was not such that he felt his testimony had any—that great validity should be attached to his testimony. I accepted Mr. Brooke's judgment in that respect".

So it was generally that Mr. Brooke, not the Secretary appraised the testimony offered. The judgment in the second Morgan appeal was based upon the fact that a fair hearing was denied both because proper argument was denied, and because evidence had not been properly appraised. At this final hearing the correction claimed was perfunctory merely and unsubstantial. Before the examiner facts and circumstances relevant to the hearing were excluded from consideration and no relief was obtained by exceptions taken before the Secretary. The rulings of the examiner were arbitrary in many cases, and were uniformly sustained upon exceptions to the Master's report. In one case the chief accountant for the Packers and Stockyards Division of the Department of Agriculture was asked whether he assisted in the preparation of the order in the Kansas City proceeding. The object, of course, was to show by whom in fact the findings and order were formulated, it having already been held that they were not framed in any legal sense by the Secretary himself. Counsel for the government interposed "objection to this particular question and all other questions of the same tenor for the reason that the Secretary's order speaks for itself" and therefore that such questions "are not germane to any issue in this proceeding". But in the first Morgan case, (298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288) the Supreme Court expressly held that "the Secretary's recitals of his procedure in such cases are not conclusive on the question whether the statutory requirements were obeyed".

■ It is to be remembered that findings and order are challenged on the ground, among others, that petitioners did not have a full and fair hearing before an unbiased tribunal, with evidence duly appraised and considered by the statutory trier of the facts. In such case the reports and testimony of subordinates are not privileged. We have here no communications affecting the interest of government in its sovereign capacity, but rather the question of whether petitioners are to be deprived of their livelihood, as the Supreme Court opinion says, by a proceeding which lacks the essential features of due process.

■ The burden exists of establishing not only a reasonable schedule of rates, but the equitable disposition of the impounded fund. In fact the latter was the real object of the reopened proceeding. This burden rests primarily upon the Secretary. This can no longer be regarded strictly as a proceeding under the Packers and Stockyards Act, which provides that after full investigation and hearing the Secretary "may determine and prescribe what will be the just and reasonable rate or charge, or rates or charges, to be *thereafter* observed in such case * * * and what regulation or practice is or will be * * * *thereafter* followed". Sec. 310 (a) 42 Stat. 159, 166. 7 U.S.C.A. § 211 (a). To this end, in an original proceeding, a reasonable forecast, based upon dependable existing and established facts, may be indulged. In the present case, however, the Secretary

is not prescribing for the future. Whatever order may result is not to be applied to future transactions.

The object to be aimed at should be, as stated by the Secretary in his reopening order, "to assure that moneys will be disposed of with equity and law", to be effected by a court of equity free in the discharge of its duty "to use broad discretion in the exercise of its powers in such manner as to avoid an unjust or unlawful result". The question then to be determined is to whom should this impounded money be distributed, and the answer to that question depends upon the reasonableness of the rates charged for the impounding period—not hypothetical rates alone, but actual rates in so far as such can be determined. We are now dealing with a past stage of livestock commission transactions; and we are told by the Chief of the Packers and Stockyards Administration, formerly Associate Chief of the Bureau of Animal Industry, that just one week prior to the issuance of this order it was then possible "as it has never been before, to determine just and reasonable rates and to prove them to be such beyond question". He concedes that any modification of the June 14, 1933, order might be heralded as an admission of error on the part of the Department. At any rate the Secretary refused to avail himself of this data, and reaffirmed the exact rates purporting to have been established by the invalidated order of June 14, 1933, although warned by his said subordinate that there was a vulnerable point in that rate structure which might expose the proposed order to criticism.

As stated by government counsel, the Secretary, instead of availing himself of the data available for determining actually reasonable rates, chose rather to act upon the old hypothetical record, casting upon petitioners the burden of producing evidence, lodged in the records of the department, and tendered to the Secretary for use before the order complained of was issued. Throughout this reopened proceeding the Secretary relied upon the appraisal of evidence by his subordinates. That was true at the former hearing, and the resulting order was held to be invalid, largely on that ground. Nothing was added to the old record by the government, and the same rulings were made although the attention of the Secretary was critically called to errors in the rate structure.

An examination of this entire record, including the testimony of the Secretary at the hearing, and the exhibits offered, convinces that the reopened proceeding, no more than that resulting in the invalid order of June 14, 1933, satisfies the requirements of due process in the administration of this section of the Packers and Stockyards Act. No attempt was made to ascertain the reasonable rates applicable to the business of the impounding period from the standpoint of available actual experience, but, on the contrary, the sole object was the patent purpose to validate the rates prescribed by the invalid order of June 14, 1933, in accordance with a preconceived construction of the Packers and Stockyards Act.

The rates in existence prior to the order of June 14, 1933, were the legal rates until found to be unreasonable by valid order. We think that not only should the present order be invalidated, but also that this prolonged litigation should be ended by restitution to the market agencies of the impounded monies which resulted from commissions earned under the provisions of rates then in force, and not since effectively challenged. The opportunity to determine the reasonableness of these rates "beyond question" was tendered by the Associate Chief of the Bureau of Animal Industry himself, but the offer was ignored as in conflict with the obvious purpose of avoiding what "might be widely heralded as an admission of error on the part of the Department", in prescribing the rates improvidently forecast by the invalid order of June 14, 1933.

The records of the Clerk of this court show approximately 1,870,000 separate items of the impounded funds, arising out of a multitude of transactions, with a correspondingly large number of shippers. The amount of such deposits are of comparatively small significance to the shippers, while to the petitioners they involved the very existence of their market agencies.

A decree will be entered in conformity with these conclusions.

Counsel may with due expedition submit for the consideration of the court such findings and conclusions as they may deem appropriate.

REEVES, District Judge (concurring).

I concur in the very clear and able opinion of Judge VAN VALKENBURGH,

presiding judge, but in doing so desire to express the following:

At the first trial of these cases this court erred in striking out an averment in the several petitions to the effect that the Secretary of Agriculture had not personally considered and promulgated what he regarded as his reasonable commission rates. We sustained the rates prescribed by the Secretary of Agriculture. The Supreme Court reversed the cases. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288.

Upon a second trial, after the averments were restored, we again found that there was substantial testimony to support the reasonableness of the rates prescribed by the Secretary. However, on the second appeal, the Supreme Court found that the Secretary had not granted the full hearing contemplated by the Packers and Stockyards Act and held invalid the challenged order of the Secretary made June 14, 1933. We had previously enjoined the enforcement of the order until the question of its validity could be determined on its merits.

When the case was reversed the last time (Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129), this court ordered distribution of the funds impounded by a previous order to the several marketing agents who are plaintiffs. An appeal was taken from this order, and the Supreme Court again reversed our order. United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211.

In this last decision the court held that before distribution should be made it was within the right and proper function of the Secretary of Agriculture to investigate, and (307 U.S. page 190, 59 S.Ct. page 799, 83 L.Ed. 1211) "if the Secretary shall determine that the rates exacted by aid of the court, and paid into its registry, are excessive," then (307 U.S. page 198, 59 S.Ct. page 803, 83 L.Ed. 1211) "his determination, if supported by evidence and made in a proceeding conducted in conformity with the statute and due process, will afford the appropriate basis for action in the district court in making distribution of the fund in its custody."

The decision of the court was handed down on May 15, 1939. Immediately thereafter the Secretary of Agriculture reopened the case for further hearing, and among other things ordered as follows:

"It is also ordered that the 'Proceedings, Findings of Fact, Conclusion and order', as issued by the Secretary of Agriculture on June 14, 1933, be served upon said market agencies as the tentative findings of fact, conclusion and order of the Secretary of Agriculture in this proceeding; and

"It is further ordered that said market agencies be and they are hereby given thirty (30) days from the date of service hereof within which to file exceptions to said tentative findings of fact, conclusion and order, in accordance with the rules of practice adopted by the Secretary of Agriculture, governing the procedure in such cases, and within which to make any appropriate motions or objections with respect to further proceedings in this case."

Pursuant to this order the case was "reopened" and additional testimony submitted by petitioners, not by the government.

The opinion of the Supreme Court reported 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129, was rendered April 25, 1938. It was in that opinion the court held that the Secretary of Agriculture had not given full and fair hearing as required by the law.

On May 8, 1938, a letter from the Secretary appeared on the editorial page of the New York Times wherein he used the following language: "Actually, (referring to the opinion of the Supreme Court) the effect is to give to the Kansas City commission men and their attorneys $700,000 of impounded money which rightfully belongs to the farmers."

In this hearing or trial, counsel for the petitioners have again raised sundry questions. It is contended by them that the Secretary failed to find the rates in force unreasonable as of the date he prescribed his rates, and that the rates so "prescribed" are themselves not reasonable and not supported by the testimony in the case. Moreover, it is contended that the Secretary again failed to give the full hearing contemplated by law and that he did not exercise a judicial disinterestedness, but, on the contrary, was clearly biased and therefore disqualified to hear the case. These will be briefly considered:

1. One of the contentions made by the petitioners is that the rates prescribed were identical with those found invalid by the Supreme Court and that same were based upon opinion evidence and on evidence in the nature of a forecast predicated upon prior experience over a period of years immediately preceding the said order of June 14, 1933.

Since the period covered by the order had elapsed it is the contention of the petitioners that the actual experience of the companies was not only available, but easily ascertainable by the Secretary, and that, if such experience had been carefully studied, it would have revealed the utter inadequacy of the rates prescribed by the Secretary and the reasonableness of the rates in force.

It appeared from the evidence that the Secretary relied upon the same evidence presented to him at the original hearing, and that he made but scant reference to the actual experience of the company during the period the excess commission rates were impounded.

Mr. Justice Cardozo, in West Ohio Gas. Co. v. Public Utilities Commission of Ohio, 294 U.S. 79, 55 S.Ct. 324, loc. cit. 325, 79 L.Ed. 773, loc. cit. 82, expressed the proper rule by saying that a prophesy should not be given first place over actual experience: "A forecast gives us one rate. A survey gives another. To prefer the forecast to the survey is an arbitrary judgment."

In this case it was undoubtedly the duty of the Secretary to disregard the opinion evidence and forecasts which formed the basis for his original order and to adhere completely and entirely to the evidence which revealed the actual experience of the market agencies during the time the excess commissions were collected and impounded. So far as the market agencies were concerned, the income used by them was precisely that prescribed by the Secretary. The practical effect of such rates in their business operations would have disclosed their reasonableness or the opposite.

Furthermore, according to the undisputed testimony, as well as facts admitted by the government, radical changes in business operations due to extrinsic factors were effected immediately following the promulgation of the rates of June 14, 1933. Prior to that time marketing agencies had received livestock largely by carload shipments, but subsequent to that time the use of the automobile truck became a strong and potent factor. Consignments were therefore in much smaller lots and market salesmen were required to devote the same time, energy and skill for the disposal of a small consignment as had been given previously to carload shipments.

These business variations necessarily and inevitably wrought great changes in the market agency operations and required a greater marketing force and more intense activity. It does not seem reasonable that the trial examiner could have been accurate in his tentative report when he found that the new rates prescribed by the Secretary would check to the penny with the rates prescribed in the invalidated order.

2. There were market agencies operating at the stockyards which conformed to the schedules prescribed by the Secretary. Evidence that these agencies became involved in financial difficulties was rejected by the Secretary on the ground that it did not appear definitely that such financial difficulties arose from the new rates. It would seem that this evidence was competent, at least for the purpose of showing what the experiences of the agencies were in their operations, to the end that the Secretary might have been informed as to the part his rates may have played in the financial difficulties of those agencies.

3. On the question of a fair and full hearing, it appeared that the Secretary was disposed to enforce the original rates prescribed by him. His order reopening the case confirmed that, although at that time the actual experience of the market agencies would have properly supplanted all prophecies and predictions and opinion evidence. The Secretary notified the market agencies that "the proceedings, findings of fact, conclusion and order of June 14, 1933," should again be served upon them "as the tentative findings of fact, conclusion and order of the Secretary of Agriculture in this proceeding."

The plaintiffs, or petitioners, were then given a limited time "within which to file exceptions to said tentative findings of fact, conclusion and order," etc.

A schedule derived from a hearing previously condemned by the Supreme Court as violative of due process was again put forward as a challenge to the petitioners to find fault with it. The offer of the petitioners to direct the inquiry into a reliable and dependable field of inquiry was unavailing. To refuse to consider competent evidence and to disregard the ordinary rules of logic and common experience is just as harmful to a litigant as if a tribunal clothed with quasi judicial authority had refused to hear the evidence at all.

4. The attitude of the Secretary was disclosed by his letter printed in the New York Times, as follows: "Actually, the effect is to give to the Kansas City commis-

556

sion men and their attorneys $700,000 of impounded money which rightfully belongs to the farmers." In addition to this, at the trial there was lack of frankness on the part of the government and a disposition not to make full disclosure of all the facts.

It is my view that the order of the Secretary is unreasonable and that it was without evidentiary support. Furthermore, the Secretary did not grant to the petitioners the full and fair hearing contemplated by law, and he was disposed too strongly in favor of one side in the controversy.

5. However this proceeding is no longer an administrative matter under the Packers and Stockyards Act, but it is now simply a question as to who in equity and good conscience should have the impounded funds. On technical grounds the order of the Secretary of June 14, 1933 was invalidated, but notwithstanding this fact it is contended that the order was meritorious and that the facts duly considered would support it.

On this equitable issue the Secretary again tenders as reasonable a schedule of rates based upon a forecast derived from past experience, and asks that these be made to prevail over facts showing actual experience in substantially and radically altered conditions and circumstances. Clearly the rates thus derived are not now dependable and should be rejected as inapplicable to the facts and as unreasonable in the light of the actual facts.

Moreover, the Supreme Court did not intend by its last opinion to order a new trial, but simply that this court should determine the equities of the parties. This could have been accomplished by quick reference to the experience of the petitioners over the period June 14, 1933, to November 1, 1937, without the necessity of using opinion or speculative evidence.

The case of Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451, is decisive upon the facts here presented. The court, in referring to the authority of the Interstate Commerce Commission under practically identical circumstances (295 U.S. loc. cit. 312, 55 S.Ct. loc. cit. 718, 79 L.Ed. 1451), said: "The Commission was without power to give reparation for the injustice of the past, *but it was not without power to inquire* whether injustice had been done and to make report accordingly."

In doing this, the court further said (295 U.S. loc. cit. 318, 55 S.Ct. loc. cit. 720, 79 L.Ed. 1451): "The claimants do not sustain the burden that is theirs by showing that the master set up a reasonable schedule. *They must show that the other schedule, the one set up by the Commission, is unreasonable."*

Even before that, 295 U.S. loc. cit. 317, 55 S.Ct. loc. cit. 720, 79 L.Ed. 1451, the court said significantly: "There is a zone of reasonableness within which judgment is at large."

Therefore, according to the last opinion of the Supreme Court, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211, the Secretary cannot prescribe a retroactive schedule of rates, but he may only challenge the reasonableness of the rates in force. The court said, 307 U.S. loc. cit. 198, 59 S.Ct. loc. cit. 803, 83 L.Ed. 1211: "A proceeding is now pending before the Secretary in which, as we have seen, he is free to determine the reasonableness of the rates."

This relates to the rates actually charged by the marketing agencies. It does not follow that the rates collected are unreasonable because the Secretary finds a different schedule reasonable, and particularly since the Secretary's schedule is predicated upon the assumption of facts admittedly no longer existing.

OTIS, District Judge (dissenting).

I regret I cannot concur with the conclusions reached by my colleagues and presented by them with their usual clarity and force. I have been reluctant to dissent. It has seemed to me that if I did not agree with associates so able, whose experience in the judicial service is much greater than my own, quite probably I should be wrong. I have not found it possible, however, despite all my endeavor, in this one matter, to go along with my colleagues. The issues involved are so important, the amount at stake so huge, that I conceive that every judge sitting on the court owes it to the Supreme Court and to the parties to contribute according to the best of his understanding to what shall be the final decision. It may be that I have been motivated, although I am not conscious of it, by a desire to be consistent. (I should remember the well known saying: "Consistency is a virtue of small minds.") I wrote the two earlier opinions of the court. D.C., 8 F.Supp. 766; D.C.,

23 F.Supp. 380.[1] In the first the court held that the Secretary's order (identically the same order as that now under review) was sustained not only by substantial evidence but by the weight of the evidence and that there was no justification for petitioners' contention that they had been denied a "full hearing." In the second opinion, in which special attention was given to the question of the Secretary's procedure, it was again held that the Secretary's order (identically the same order as that now under review) was sustained not only by substantial evidence but by the weight of the evidence and that the parties had been given a "full hearing." Judge VAN VALKENBURGH concurred, *hesitatingly*, in the first opinion. From the second opinion he dissented on the procedural issue only. Judge REEVES now has joined Judge VAN VALKENBURGH. I am left abandoned and alone in the position all once defended. There comes to my mind out of long past school days the opening sentence of a sometime famous ballad: "The boy stood on the burning deck whence all but him had fled."

My colleagues, I think, have not been able to accept a certain new philosophy—nor do I accept it, although I recognize it, and I bow to it when Congress incorporates it into a valid statute—a philosophy that exalts the administrative agency and correspondingly lessens the powers of courts of justice. Congress has said that, on judicial review, findings of fact made by such an agency, if supported by evidence, shall be conclusive. And so the judicial review becomes largely without significance. It looks, not to substance, but to form. The overwhelming weight of the evidence (the testimony of twenty witnesses) may support one finding; a minimum of substantial evidence (the testimony of a single witness) may support the opposite finding. If the administrative agency, actuated by pique or prejudice or class interest or a consideration of the number of votes to be gained by "the party," finds against the weight of the evidence, the reviewing court is helpless. And if, under compulsion of law, the reviewing court affirms the agency, it is proclaimed to the world that the United States District Court or the Circuit Court of Appeals or the Supreme Court of the United States has endorsed and approved what the agency has done. It is not unnatural that judges should look with disfavor on such a consequence.

How superficial it is to compare such an arbitrary—possibly even dictatorial—fact-finding power with the fact-finding power of a jury. The jury is constantly under the supervising control of the judge. The judge excludes evidence that is irrelevant, immaterial, or otherwise incompetent. He reviews and sums up the case. He inspires the jury at the hour of its final functioning with the high ideals of justice and truth. And he may set aside whatever verdict the jury has returned.

I think my colleagues have not been able to accept the new philosophy seen in another aspect. To them the "full hearing" which the law requires an administrative agency to give the parties means a hearing comparable in all important details to the historic judicial hearing, a hearing in the solemn and dignified atmosphere of a court room, where the testimony, received under the time-tried rules of evidence, is presented orally to a trained judge, to an impartial judge (the parties may have him removed for bias and prejudice if he is deemed not impartial), to a judge who hears the arguments of opposing counsel and thereafter decides the matters in issue. It is a far cry, my colleagues think (and so think I) from that kind of hearing to such a hearing as that contemplated by, for example, the Packers and Stockyards Act, 7 U.S.C.A. § 181 et seq., where the testimony is taken by an examiner (who may also be in fact active counsel for one of the contending parties), where the deciding power is vested in an official who never sees a witness, where the ultimate authority cannot practicably even read the evidence (although he may be compelled

---

[1] I wrote also the per curiam opinion (D.C., 24 F.Supp. 214, 215) announcing the judgment of this court, which was reversed in 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211. This court had held the Secretary's original order valid. The Supreme Court on review said it was invalid. This court had compelled a deposit of money by the petitioners "on the understanding and assurance that the fund so created would be returned if the Secretary's order were held invalid." This court thought it should abide by its pledged word. The Supreme Court, however, decided in 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211, that the fund which had been collected on a definite understanding should be disposed of as *equitable principles might require*.

to say he has done so), where there is no satisfactory way under Heaven to dislodge a biased and prejudiced agency and secure another, and where the decision of the agency, so functioning, as to every issue of fact, if supported by any evidence (however defiant of the weight of the evidence), is made as conclusive as the command of a despot. My colleagues find it difficult to see "due process of law" in such a medley of ritual and form and shadow. I honor and respect them for their steadfastness.

Scope and Nature of Duty of District Court.

1. The scope and nature of the duty of this court was made quite clear in the opinion of Mr. Justice Stone when this case last was before the high tribunal. 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211. The rate fixing order of the Secretary had been held invalid, not on the merits, but solely by reason of a defect in the procedure. The Secretary sought to remedy his procedural error by giving the parties another hearing in which he would avoid his earlier mistakes and make what the Supreme Court called a "redetermination" (307 U.S. loc. cit. 188, 59 S.Ct. loc. cit. 798, 83 L.Ed. 1211) concerning whether the rates collected were reasonable. Until that "redetermination" is completed the district court should hold the fund impounded. When the "redetermination" has been made it will "afford a proper basis for the action of the district court in making disposition of the fund." 307 U.S. loc. cit. 193, 59 S.Ct. loc. cit. 801, 83 L.Ed. 1211. "The court, called on to ascertain, according to equitable principles, the rights of the parties with respect to payments made under the voidable order, could take into account the subsequent determination of the administrative agency as the basis of its action." 307 U.S. loc. cit. 196, 59 S. Ct. loc. cit. 802, 83 L.Ed. 1211. The Secretary's "determination, if supported by evidence and made in a proceeding conducted in conformity with the statute and due process, will afford the appropriate basis for action in the district court in making distribution of the fund in its custody." 307 U.S. loc. cit. 198, 59 S.Ct. loc. cit. 803, 83 L.Ed. 1211. "The district court * * * with the full record of the Secretary's proceedings before it, including findings supported by evidence, * * * will have the appropriate basis for its action and will be able to make its order of distribution accordingly." 307 U.S. loc. cit. 198, 59 S.Ct. loc. cit. 803, 83 L.Ed. 1211.

The duty of this court then is now to ascertain: (1) Whether the Secretary's "redetermination", his "final order in the proceedings pending before him" (307 U.S. loc. cit. 198, 59 S.Ct. loc. cit. 803, 83 L.Ed. 1211), is supported by evidence; (2) whether it was made after a "full hearing"; and (3) to distribute the fund, with the final order as the basis of distribution, if there was supporting evidence for the order and a "full hearing." Of course the burden of proof is on those who attack the Secretary's order, which presumptively, is valid.

Is the Order Supported by Evidence?

2. I shall devote little space to a discussion of the first inquiry which the Supreme Court has said we must pass upon. Twice this court has held, as I have noted (and the Supreme Court emphatically called attention to the fact in the third Morgan opinion, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211), that an order of the Secretary, identical with the order [2] now under review, was supported by substantial evidence. Indeed, as also I have noted, this court went further and held the order was sustained by the weight of the evidence. But exactly the same evidence (and a little additional evidence) is before the court now as was before it on the first and second hearings. With the same evidence and the same order again before the court how can we say that the order, which we have hitherto said was supported by the weight of the evidence, is not supported by any evidence? Shall we forget or ignore on Wednesday what we said on Tuesday and also on Monday? Shall we too repudiate the doctrine of stare decisis, not only generally, but in later stages of a case after clear and definite rulings in earlier stages of the same case. To do these things would make me to blush with all the changing colors of the chamaleon. I hasten to say that my colleagues are not embarrassed because they sincerely believe that somehow the whole picture has changed with

---

[2] I have used in this opinion the word "order" to designate the Secretary's "redetermination" as to the unreasonableness of the filed rates and as to what would have been reasonable rates because the Supreme Court used that word in 307 U.S. loc. cit. 198, 59 S.Ct. 795, 83 L.Ed. 1211. There is, of course, a distinction between the Secretary's original prospective order and this last retrospective order.

the passage of time, as the turn of a kaleidoscope varies what the observer beholds.

For myself, I am helped by the imagery suggested by the terminology which judges and lawyers are wont to use. We speak of "substantial evidence," of a "scintilla of evidence," of the "weight of the evidence." They are terms which suggest a pair of balances. A weight is deposited in one balance. The beam is deflected. That is "substantial evidence." Again, weights are alternately deposited in each balance. Now the beam again is deflected on that side where is the "weight of the evidence." Perhaps only an airy feather is deposited in a balance. It is too light to have any effect —a mere "scintilla of evidence."

On the first presentation of this case to us and again on the second presentation we saw the evidence of the petitioners deposited in one balance and that of the respondents in the other. The index showed that the evidence in respondents' balance not only was "substantial evidence," but also that the "weight of the evidence" was there. Now on the third presentation nothing has been taken away from respondents' balance, nothing has been taken away from petitioners' balance. A little has been added on petitioners' balance. Perhaps that little that has been added is enough to change the "weight of the evidence" from one side to the other. But certainly the mere addition of something in one balance cannot have the effect of changing the nature of what is in the other balance from what was "substantial evidence" to a mere "scintilla" or to nothing at all.

I do not doubt that my colleagues would agree at once with such elementary truths. It is their view, if I understand it rightly, that what was "substantial evidence" supporting at the earlier hearings the Secretary's order was only *prophesy* (competent perhaps when only prophesy was available) and that it loses all value—ceases to be "substantial evidence"—when contradictory evidence based on actual experience is available. It is convincing reasoning, as clearly was pointed out by Mr. Justice Cardozo in West Ohio Gas Company v. Public Utilities Commission, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761. But the application of that reasoning to this case is most doubtful. If one looks to the record and not to the dramatically worded briefs of petitioners' learned counsel (which over and over again take a little, a scarcely discernible mole-

hill, and build it up into a towering, snow-clad Everest) he will discover how inapplicable the excellent abstract reasoning of my colleagues is to the facts here presented. The simple truth is, unless I err (and I err frequently and with much facility), the simple truth is that there is in this record no competent evidence showing conclusively out of actual experience what would have been the effect of the Secretary's order, if its enforcement had not been enjoined. At best, the evidence tendered in this connection was shadowy, based on hearsay and speculation. It fell far short of that cogency that would have been necessary to transmute into thin air what this court hitherto held was "substantial evidence."

### Requirement of "Full Hearing" Met.

3. Just as this court twice has held the Secretary's order was supported by substantial evidence, so it twice has held that the Secretary gave the parties that "full hearing" the law requires. Certainly the showing of "full hearing" is much stronger now. Nor should that be surprising. Since the last hearing the Secretary has been taken to the "wood shed" by the Supreme Court (he will not object, I trust, if I choose a figure from our common rural background). He came out chastened, with an understandable desire thereafter to walk the chalk line. It would be strange if he had not profited from his lesson. My colleagues, however, who now attack on both front and rear, who now smite the Secretary, hip and thigh, think he has wandered from the true path even when he just had been given a chart and compass.

Why did the Supreme Court hold in the second Morgan case (304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129) that the Secretary had not given a "full hearing"? The essence of the opinion is that he did not do so because he accorded the petitioners no reasonable opportunity "to know the claims of the opposing party and to meet them." 304 U.S. loc. cit. 18, 19, 58 S.Ct. loc. cit. 776, 82 L.Ed. 1129. (1) There was no specific complaint at the inception of the proceeding. 304 U.S. loc. cit. 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129. (2) There was no report by the examiner. 304 U.S. loc. cit. 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129. (3) No findings were proposed by the government. 304 U. S. loc. cit. 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129. (4) The oral argument before the Secretary did not reveal the claims of the Government in an adequate manner. 304 U.S. loc. cit. 19, 82 L.Ed. 1129. (5) The

Government did not submit a brief setting out its claims. 304 U.S. loc. cit. 19, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

The Supreme Court did not say and clearly did not intend to say that there should have been a revelation to the petitioners of the Government's claims by *all* of the methods mentioned in the foregoing analysis as (1), (2), (3), (4), and (5), but that, before the Secretary acted, the claims of the Government should have been made known to the petitioners *by some one or more* of those methods or by some other method. It is important, moreover, to bear in mind that the Supreme Court distinguished between the *Secretary,* the administrative tribunal with power to decide, and the *Government,* the adversary party. The distinction is not clearcut since the *Government,* in a proceeding before the *Secretary,* is made up of attorneys and examiners appointed by and representing the *Secretary* (in a sense the *Government* is the *Secretary's alter ego),* but nevertheless it is a real distinction. The Supreme Court did not say and did not intend to say that the petitioners were entitled to be heard not only as to what, if any, were the claims and contentions of the Government, the adversary party, but also as to each and all of the conclusions reached tentatively or otherwise, after submission, by the administrative tribunal, on the way to its final judgment. The Supreme Court said (304 U.S. loc. cit. 18, 58 S.Ct. loc. cit. 776, 82 L.Ed. 1129): "We agree with the * * * contention that it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions, if he gave the hearing which the law required."

This opinion of the Supreme Court, when it has thus been analyzed, may be laid to one side. The petitioners do not even assert in the briefs submitted on the procedural issue that the standards set up in this opinion and held not to have been met were not fully satisfied at the last proceeding before the Secretary.[3] There is now no suggestion

that the petitioners were not fully advised by an examiner's report, by written briefs, and by full statements in oral argument, exactly what the contentions and claims of the Government were, with full opportunity for counter argument. Indeed it is inconceivable that the Secretary would not have complied with the requirements of "full hearing" so plainly and so recently set out by the Supreme Court.

It is true that in the oral argument before this court it was suggested that certain findings additional to those recommended by the Government were made in his final decision by the Secretary and it was contended that petitioners should have had a chance to present an argument concerning these findings. The argument is not valid. It fails to make the distinction between the Secretary *as the tribunal* authorized to make a decision and the Secretary *as prosecutor* through a Bureau in his Department and his subordinates. The Supreme Court makes the distinction. The adversary party (adversary to petitioners) is not the Secretary *as tribunal* but *the prosecuting subordinates* in the Bureau of Animal Husbandry. They are the *Government* in this case. Petitioners are entitled to know what the *Government* contends and to have opportunity to answer those contentions before the tribunal makes its decision. The petitioners are *not* entitled to be heard upon the tentative conclusions the Secretary has reached, in the evolution of his thought, after submission and before final judgment.

The truth is the petitioners do not rely upon the so-called second Morgan opinion and decision (in 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129) which reversed the judgment of the court after this court had found that the Secretary had given the petitioners a "full hearing." They rely upon what was said in the so-called first Morgan opinion and decision. 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288. That decision therefore must be analyzed and the last proceeding before the Secretary tested by its standards.

---

[3] It is impossible to escape the conclusion that the petitioners recognize that the last proceeding before the Secretary was strictly in conformity with the requirements of a "full hearing" set up by the Supreme Court in the second Morgan case. Thus on page 12 of petitioners' brief now submitted to this court on the procedural issue it is said: "The Secretary's reopening order of June 2, 1938, recognized only one defect in the

prior hearing before him, to-wit, the failure to accord to the market agencies the opportunity to argue with respect to the invalidated findings." *But that was the only defect in the hearing which the Supreme Court pointed to in the second Morgan case.* Petitioners seem to concede that that defect at least was avoided in the last proceeding before the Secretary.

This court did test the original proceeding before the Secretary by the standards set up in the first Morgan decision. A majority of this court held that by these standards petitioners had been accorded a "full hearing." The majority of this court after a full discussion of the matter (D.C., 23 F. Supp. 380, pages 382, 383) declared the Secretary had done everything the law required of him and made a full finding of fact (23 F.Supp. page 383, 2nd column) as to what in that connection he had done.

In the second Morgan case the Supreme Court did not criticize the opinion of this court or its finding of fact just referred to. The opinion of the Supreme Court does not intimate that any fact found by this court was not correctly found. *The Supreme Court decided the case upon an argument which never was presented to this court by pleadings or briefs or orally,* namely—that petitioners did not have a "full hearing" in that the Government's claims and contentions were presented to the Secretary ex parte, that they had no opportunity to reply to those claims and contentions before the Secretary reached his decision. Except for that new argument advanced for the first time in the Supreme Court there is no reason for believing that the judgment of this court on the procedural issue would not have been affirmed.

The Supreme Court said in the first Morgan opinion that a "full hearing" does not require that there should be an examiner's report to which the parties might except. 298 U.S. loc. cit. 478, 56 S.Ct. loc. cit. 910, 80 L.Ed. 1288, but see 304 U.S. loc. cit. 21, 58 S.Ct. loc. cit. 777, 82 L.Ed. 1129. A "full hearing" does not mean that the evidence taken may not be sifted and analyzed by subordinates and only the results of that sifting and that analysis submitted to the Secretary. 298 U.S. loc. cit. 481, 56 S.Ct. loc. cit. 912, 80 L.Ed. 1288. The Supreme Court said only that a "full hearing" means —"there must be a hearing in a substantial sense. And to give the substance of a hearing * * * the officer who makes the determinations must consider and appraise the evidence which justifies them". It is intimated also, but not squarely held, that opportunity for argument, either written or oral, before the Secretary must be afforded.

Now in what way is it charged that these broad standards, which this court held were fully satisfied in the original proceeding, were not satisfied in the last proceeding?

## Petitioners' Brief Advances Five Contentions.

*The first contention* of petitioners, that the petitioners were denied a "full hearing" because there was not an *impartial* tribunal, needs be discussed but briefly. The contention is bottomed on a letter the Secretary wrote in such a moment of intemperance as comes to all (even to some judges, who, however, are sufficiently cautious not to put what they freely say in written form), in which he said after this litigation had been in progress for several years and had been twice decided by this three-judge court in the Secretary's favor—in which he said in substance—*the three-judge court which alone has passed upon the merits was right, the money "rightfully belongs to the farmers" who paid commissions.*

Certainly no such statement made by a trial judge in a constitutional court, after a first trial, would support an affidavit of bias and prejudice against him at a second trial. Moreover no statute authorizes an affidavit of bias and prejudice against the Secretary of Agriculture under any circumstances, just as there is none which authorizes an affidavit of bias and prejudice against a justice of the Supreme Court or a judge of a Circuit Court of Appeals.

It is argued that, absent any statute setting up machinery for disqualifying the Secretary and securing a substitute (authorizing the Secretary, for example, to call in the Postmaster General), the right to disqualify is implied in the phrase "full hearing." Does not a "full hearing" require, it is asked (and Justice Brandeis, speaking in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, at page 73, 56 S.Ct. 720, at page 735, 80 L.Ed. 1033, is quoted), "that the trier of the facts shall be an impartial tribunal"?

Of course the "full hearing" required by the statute implies an impartial tribunal. Just so the Constitution and laws require that the Supreme Court and the circuit courts of appeals shall be impartial tribunals. The remedy if a circuit judge shall play the tyrant is by appeal to the Court of Impeachments. The remedy, if the Secretary shall violate his duty, is by appeal to the President to remove him or to the Court of Impeachments. The celebrated case of Tumey v. Ohio, 273 U. S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L. R. 1243, cited by petitioners, has no applicability whatever. In that case the Supreme Court held, not that a decree of a

judge not impartial is void, but that a state statute creating a judicial system in which judicial partiality certainly would arise, violates the due process clause of the Fourteenth Amendment.

*The second contention*—that the Secretary initiated and conducted the last proceeding in an unfair manner—is hypertechnical. It disregards the broad interpretation rightfully placed by the Supreme Court on the meaning of "full hearing." That interpretation ignores mere mechanics and considers only the right of parties (1) to have the ultimate decision made by the Secretary upon the evidence, after it has been sifted and analyzed for him by his subordinates, (2) to be advised of adversary contentions, with (3) a chance to be heard concerning them, before judgment.

This second contention is said by petitioners to be supported by the reasoning of Fitchburg Steam Engine Co. v. Potter, 211 Ill. 138, 71 N.E. 933, decided by the Supreme Court of Illinois in 1904, but the inapplicability of that case is at once apparent to him who studies it. It is absurd to speak of the findings with which the Secretary began the last proceeding as "tainted" findings, as petitioners in this connection speak of them, or to suggest that the examiner who made them should not again have been permitted to act. There is no basis in anything the Supreme Court ever has said for extravagances like these. It was not that the findings were "tainted" nor that the examiner in any way had exceeded his authority, that led to the reversal of former judgment of this court. It was the error *of the Secretary* that led to that result, his failure to give petitioners notice of the Findings and a chance to oppose them in argument. That alone brought about the reversal.

*The third contention*—that the notice given by the Secretary was not a notice of the precise kind of proceeding which actually was conducted—deserves no serious consideration, unless the petitioners also say (and, of course, they do not say it) that they had no actual notice of what kind of proceeding was being conducted by the Secretary and for what purpose it was being conducted long before the proceeding was ended.

*The fourth contention*—that the Secretary did not sufficiently consider the evidence—is based wholly upon the Secretary's own testimony, taken subject to the objection that the inquiry into what he had read and had not read was improper. This court took that objection under submission with the case.

The objection ought to have been sustained. The Secretary's duty to afford a "full hearing" is the same, not in details, but in fundamentals, as that of a judge to whom a case is presented in court (certainly the Secretary's duty is not circumscribed in some closer fashion). Literally thousands of cases are submitted to federal district judges upon agreed statements of facts or upon deposition evidence not read in open court (I just have concluded a long trial in which depositions covering thousands of pages were offered in evidence but not read in court). Has anyone ever heard of a court of appeals, reviewing such a case, entertaining arguments that the trial judges did not read and consider the evidence? Certainly not. The presumption is conclusive that the trial judges have done their duty.

This court heretofore (before the first Supreme Court decision in this case) passed upon the same record as was presented to the Secretary. Our duty, as we thought it might be, was identical, in the respect now considered, with that of the Secretary, that is, to determine *from the weight of the evidence* whether the Secretary's judgment was right or wrong. A record made up of thousands of pages and of hundreds of exhibits was handed to the court. *Did any of the judges read all that record or examine all those exhibits?*

What the judges of this court did (and what, I doubt not, the justices of the Supreme Court will do when this case reaches them) was to read and hear the summaries of the evidence which the parties made in their written and oral arguments (perhaps occasionally "dipping into the transcript") and to hear and consider their respective contentions. That was a "full hearing," a judicial hearing.

Even if the objection to the Secretary's testimony should be overruled, the contention now considered is without force. To contend that the Secretary personally must have read *any part* of the original transcript of testimony is to defy the clear holding of the Supreme Court that he may have the testimony summarized and analyzed by his subordinates. The Supreme Court did not say that the Secretary must read *the very words* of *some* of the testimony. The Supreme Court did not es-

pouse the theory that the Secretary's subordinates probably would undertake to deceive the Secretary in their summaries and analysis. (It is regretable that most honorable counsel sometimes are willing to suggest that men equally honorable and unselfish—whose only fault is that they are public servants—are capable of intentional deception.) If the petitioners did not like the summaries prepared by the Secretary's subordinates (or if some of the testimony was not summarized by them), is there any suggestion that counsel for petitioners were prevented from submitting *their own summaries?* Who prevented them from summarizing anything they desired to summarize, in their briefs, in supplements to their briefs, in their oral arguments? Are they not content that the Secretary read and considered *their* summaries? Must he, the Secretary of Agriculture, the head of a great executive department of the Government, must he not only check up on his own subordinates to ascertain whether they have imposed upon him but must he also check the summaries of counsel for petitioners to make certain that they did not understate their case? And if counsel for petitioners did not present out of the record, in summarized form, whatever they desired the Secretary should especially consider, whose fault is that? Even a man sentenced by a trial judge to death, if the trial judge gave him every opportunity to be heard, would not be listened to by an appellate court with much patience, if his only complaint was that he did not take advantage of his opportunity.

*The fifth contention* (the only remaining contention on the procedural issue presented to this court) is that the Secretary failed to find that the rates charged by the market agencies were unreasonable. He found only that "the rates and charges now under investigation *contain* rates and charges which are unreasonable and unjustly discriminatory." Petitioners give little space in their brief to this contention. The play is upon the word "contain." The Secretary should have used the word "are," where he used "contain." A medieval scholastic would have loved this sort of argument, bottomed on a fine distinction drawn between two expressions which certainly are here essentially the same in meaning, although, using a word micrometer, one might discover a faint

overlapping. If a schedule of rates *contains* rates which are unreasonable is not the schedule unreasonable? But I shall give the contention as little space as petitioners give it. I know that a drowning man seizes upon straws.

Conclusion.

4. My conclusion is that (1) it has not been proved that the Secretary's order is not supported by substantial evidence, (2) that it has not been proved that the Secretary did not give petitioners a "full hearing," and (3) that the fund now held by the clerk of this court and amounting to $586,093.68 should, in equity and upon the basis of the Secretary's order, be repaid to the farmers from whom it was collected.

It is a pleasure to add a word attesting my personal appreciation (shared, I am sure, by my colleagues) for the superb, lawyer-like, scholarly presentation of their respective contentions by counsel who have appeared in this court in this case: Mr. Gage, Mr. Cowherd, and Mr. Cooke for the petitioners; Mr. Berge, Mr. Cox and Mr. Wilson for the respondents.

